**STATE of Minnesota, Respondent,**

v.

**Harlan K. KINDEM, Appellant.**

**No. C4–81–562.**

Supreme Court of Minnesota.

Aug. 26, 1983.

Rehearing Denied Oct. 24, 1983.

Harlan K. Kindem, pro se.

C. Paul Jones, State Public Defender, Susan K. Maki, Asst. Public Defender, Minneapolis, amici curiae, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, County Atty.,

Vernon E. Bergstrom, Rick Osborne, Michael Richardson, Asst. County Attys., and Beverly J. Wolfe, Staff Atty., Minneapolis, for respondent.

SIMONETT, Justice.

Defendant was charged by the grand jury in Hennepin County with second-degree intentional murder, Minn.Stat. § 609.-19 (1980), for killing 63-year-old Clifford Hoffman of Richfield by hitting him on the head a number of times with a baseball bat in the course of robbing him outside his home early on June 17, 1980. A district court jury found defendant guilty of the lesser-included offense of third-degree murder under the felony-murder doctrine, Minn.Stat. § 609.195(2) (1980).[1] The presumptive sentence for the offense of third-degree murder (which is a severity level IX offense) when committed by a person with defendant's criminal history score (three) is 149 (143–155) months in prison. The trial court departed from the presumptive sentence and sentenced defendant to 300 months in prison, which is the maximum permitted by statute for third-degree murder.

The state public defender prepared an appeal brief for defendant but defendant rejected that brief and obtained permission from this court to file his own brief. This court allowed the state public defender to file its brief as an amicus brief. Although defendant's pro se brief was untimely, the state does not seek dismissal on this ground. Issues raised by the defendant's brief and the state public defender's brief include: (1) the sufficiency of the evidence, (2) the legality of a search that resulted in the discovery of certain incriminating evidence, (3) alleged misconduct by the state in using what defendant argues was perjured testimony and in failing to locate and call certain witnesses, (4) the propriety of the trial court's denial of a mid-trial defense motion

---

1. In 1981 the legislature reclassified felony-murder of this sort committed by defendant, making it second-degree rather than third-degree murder. *See* Minn.Stat. § 609.19(2) (1982).

for a continuance to locate certain witnesses, (5) the propriety of certain evidentiary rulings by the trial court, (6) the adequacy and fairness of the trial court's instructions, (7) the prejudicial effect of the trial court's responding to questions by the jury during its deliberations without notifying defendant and the attorneys, (8) the effectiveness of representation of defendant by his trial counsel, and (9) the propriety of the sentencing departure. We affirm.

The victim, Mr. Hoffman, owned three service stations. The closings of the stations were staggered so as to allow Hoffman to pick up the receipts at each as it closed. Because he feared a robbery, Hoffman carried a handgun, for which he had a permit, and he took a circuitous route home, varying it each night. He had a safe in his basement, where he kept the money. Each morning the bookkeeper would come to the house and prepare the receipts for deposit in the bank.

On Monday, June 16, 1980, Hoffman picked up the receipts as he usually did and drove home, arriving there about 1:15 a.m. on the 17th. The next door neighbor was awakened by a sound which she described as the sound of wood falling. She sent her son outside to investigate. He found Hoffman unconscious.

Police and paramedics were called to the scene. Hoffman was taken to a nearby hospital where he underwent brain surgery. He died on June 20th. The pathologist testified that the cause of death was "a traumatic hit injury with the associated skull fracture, hemorrhage and brain injury." He testified further that his findings were consistent with Hoffman having been struck on the head four times with a softball or baseball bat.

Police found a softball bat and a ski mask near the place of the attack. Hoffman's gun was missing as were the bags of receipts he had been carrying. Hoffman's bookkeeper estimated that the robber(s) got receipts totaling nearly $6,000, of which approximately one-fourth to one-third were checks.

Michelle Webb, an acquaintance of defendant, provided police with the first big break, giving them information which incriminated defendant and others. On the basis of this information, police on June 30 obtained and executed a warrant to search defendant's grandmother's residence where defendant had been staying. This led to the discovery of a piece of paper in defendant's handwriting giving the name and telephone number of two of the victim's service stations. Subsequently, on July 3, the police put out a nationwide teletype seeking the arrest of defendant and his brother.

Defendant and his brother, having left the state the day after Hoffman died, were arrested by an Oklahoma State Trooper on July 10. A search of the car resulted in the discovery of Hoffman's gun, which was loaded, and a number of other items. Defendant and his brother waived extradition and were returned to Minnesota. Subsequently, Kari Stevens, who had been charged in connection with the offense, agreed to assist the state by testifying against defendant and his brother, James, in return for a favorable plea agreement (aggravated robbery with a recommendation of probation by the prosecutor). On October 28, 1980, a grand jury indicted defendant and his brother for second-degree intentional murder.

Michelle Webb, a key witness at defendant's trial, testified about discussions she and others had with defendant as early as April of 1980 about his plan to rob Hoffman. She also testified concerning a meeting that she had with defendant and his brother at a resort near Alexandria on June 19, after the crime. She testified that defendant had some shop work done on his car and bought supplies for a trip that he and his brother were going to take. Defendant paid for the supplies with money from a "roll of bills."

The testimony of Kari Stevens was the most damaging. Her testimony concerned not only the planning but also the execution of the crime, including her role as driver of the get-away vehicle. She testified that on Monday night, June 16, after they saw

Hoffman at the last of his three stations, she drove defendant and his brother to Hoffman's neighborhood, dropped them off and drove to a prearranged place where she parked the car and waited. She testified that they previously had hidden some baseball or softball bats in shrubbery near the house and intended to use the bats in committing the crime. She also testified that the men wore dark clothing and that defendant had a mask. She testified that while waiting she heard a man, presumably Hoffman, scream, "Oh, God, no" and then heard the sound of a bat hitting him three times. Moments later defendant and his brother jumped into the car and they took off. She testified that defendant, who was angry, said that he had hit Hoffman in the head twice and that his brother, James, had just stood there not doing anything. When she said that she knew Hoffman would die, defendant told her to shut up and that he would not die. When she asked why defendant had hit Hoffman in the head rather than in the legs as he had promised, defendant said that he got frustrated waiting for Hoffman to arrive.

Defendant, who was 28 at the time, testified in his own defense, claiming that he had planned to commit only a burglary and had told a number of people about the plan. He said that one or more of those people, including one Charles Tuck, must have committed the robbery and killed Hoffman. Defendant testified that after the crime he and his brother took some money and the gun from Tuck's knapsack. He claimed that he later began to suspect that he and his brother had been set up by Tuck and Kari Stevens. He testified that accordingly James and he left the state not to flee justice but to find and arrest Tuck and return him to Minnesota.

The jury acquitted defendant of the charged offense but found him guilty of the lesser offense of third-degree murder under the felony-murder doctrine. His brother, James, subsequently pleaded guilty to third-degree murder and was sentenced to 94 months in prison, which is at the low end of the presumptive sentence range (94–100) for the offense in question by a person with a zero criminal history score. In his testimony at the hearing on whether to accept his guilty plea, James implicated defendant in the murder. James' sentence was affirmed in *State v. Kindem,* 313 N.W.2d 6 (Minn.1981). As we indicated earlier, the presumptive sentence for defendant, based on a criminal history of three, was 149 (143–155) months in prison. The trial court sentenced defendant to 300 months in prison, the statutory maximum for the offense.

■ 1. Defendant's first contention is that the evidence of his guilt was legally insufficient. This contention is meritless. The record is replete with evidence that defendant not only planned and committed the robbery but inflicted the blows that resulted in Hoffman's death.

2. Defendant's next contention is that the trial court prejudicially erred in refusing to suppress a letter found in the search of the apartment of one Kim Stevens on August 14, 1980.

The facts relating to this contention are as follows. On August 14 defendant was arrested on a federal warrant for being in possession of a handgun, namely Hoffman's gun. That arrest occurred at the apartment of Kim Stevens, where defendant was staying. While executing the warrant, agents saw marijuana in plain sight. Kim Stevens picked up her purse and asked to leave. The officers said that they were going to try to get a search warrant to search for evidence relating to the marijuana offense and said that she could not take the purse without letting them examine it because they did not want her removing evidence. She then told them that there was marijuana in the purse. The officers obtained a warrant to search for marijuana, for drug paraphernalia, for drug notations and address books reflecting drug sources, and for notes showing sums of money paid for drugs. When they executed the search warrant, they found a brown paper bag containing handwritten material concerning the Hoffman robbery. An agent then telephoned Richfield police, who obtained another search warrant and subsequently

seized the papers. The papers seized consisted of a letter written by defendant intended for Kari Stevens, who was then in jail, in which he set forth his version of the offense, which he termed a "pat alibi."

At the omnibus hearing defendant's counsel argued that the officers' discovery of marijuana in the apartment and in Kim Stevens' purse did not give them probable cause to look through personal papers and documents. The prosecutor responded that the officers could not have been more careful about the rights of the parties. The trial court denied the motion to suppress.

On appeal defendant argues that the affidavit in support of the search warrant, prepared after the marijuana was discovered, fails to recite sufficient facts to support the belief that the police would find "drug notations and address books reflecting drug sources." He also argues that the state cannot justify the seizure by relying on the "plain-view" doctrine because it was not "immediately apparent" to the officers when they came upon defendant's letter that it was what they were looking for or that it was evidence of some other crime. Finally, defendant argues that admitting the evidence was prejudicial because, although the letter was consistent with defendant's trial version of the offense, it also contained the phrase "pat alibi" as a characterization of that version, which bolstered the state's theory that defendant's letter was an attempt to get Kari Stevens to perjure herself.

The state responds by arguing first that the affidavit in support of the warrant established the necessary probable cause through the affiant's statement that in his professional experience purchasers of marijuana typically preserve records of purchases and prices and notes on how to contact sources. Thus, any notations in defendant's handwriting would be immediately suspect and within the bounds of the warranted search. Alternatively, the state argues that in any event the warrant properly authorized the police to look for marijuana and that the letter was properly discovered during

that search and was seizable evidence of another crime.

The issue of the search and seizure of private papers is an issue which can arise in a variety of contexts, including the warrant-authorization context (part one of the defendant's argument) and the context of a discovery during the course of a valid search (part two of the defendant's argument).

One case addressing the issue is *United States v. Crouch,* 648 F.2d 932 (4th Cir.1981), *cert. denied,* 454 U.S. 952, 102 S.Ct. 491, 70 L.Ed.2d 259 (1981), which dealt with letters discovered during the warranted search of a house for drug manufacturing equipment and paraphernalia. During the course of the search the agents discovered letters from the defendants to each other. Upon reading the letters the agents found that they contained information concerning the manufacturing of drugs. The court upheld the seizure of the letters under the "plain-view" doctrine. The court ruled that although it was necessary to read the letters in order to determine if they were seizable, their incriminating nature was nonetheless clearly and immediately apparent. A case on the other side of the issue is *United States v. Wright,* 667 F.2d 793 (9th Cir.1982). There the agents were executing a warrant to search for a driver's license which was sought as evidence of an alleged firearm violation. While looking for the license, the agents found a ledger book and began reading it to examine its contents. Concluding that it contained narcotics notations, they seized it. The ledger was later used against the owner in a prosecution for tax evasion. The Ninth Circuit, in reversing, held that the agents acted unlawfully in seizing the book because there was nothing facially incriminating about the ledger, and the officers had no reason to read its contents in their search for the driver's license.

The United States Supreme Court's latest decision dealing with the "plain-view" seizure doctrine in general and the "immediately-apparent" requirement in particular does not shed any light on the particular issue. *See, Texas v. Brown,* —— U.S. ——,

103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). A Minnesota case of interest is *State v. Severtson,* 304 Minn. 487, 232 N.W.2d 95 (1975), where we reversed a pretrial order that suppressed papers found and seized in a lawful search of a farm of one Dennis LaCore for marijuana. The officer discovered the papers in a bureau drawer containing controlled substances other than marijuana. The pages and letters bore defendant Severtson's name and were seized as evidence tending to establish that the drugs in the drawer were his. We held that the papers were seizable because they were "immediately facially recognizable as evidence which would connect defendant to the drugs found in the bureau drawer." 304 Minn. at 490, 232 N.W.2d at 97. Professor LaFave's treatise contains an interesting discussion of the general issue of seizure of private papers. *See* 1 W. LaFave, *Search and Seizure* § 2.6 (1978).

■ We do not decide whether the police violated defendant's Fourth Amendment rights in this case, because even if admission of the evidence in question was error, it was harmless error. Although the letter does characterize the alibi as a "pat alibi," the letter also insists that it is "truth and fact." Further, even if the letter was evidence that defendant was trying to get Kari Stevens to perjure herself, there was other evidence, properly admitted, which indicated the same thing. In particular, there was evidence that defendant had asked his girl friend to lie for him. Finally, of course, the evidence of defendant's guilt was overwhelming. The combination of these factors satisfies us that any error was harmless beyond a reasonable doubt.

■ 3. Defendant's next argument is that the prosecutor used perjured testimony and otherwise committed prejudicial misconduct by failing to locate and call certain witnesses. Defendant contends that the state knowingly used perjured testimony, particularly when it relied on the testimony of Michelle Webb and Kari Stevens. The record simply does not support defendant's claim. Defendant also contends that the state failed to make a good faith effort to locate and call certain witnesses, namely, Charles Tuck, Kim Stevens, and one Mike Gallagher. The record indicates that the state was unable to locate Tuck and Gallagher. In any event, if the witnesses were available, defendant could have called them. The state was not obligated to do so. Rather the state's obligation was to prove its case in a fair way without concealing any material evidence from the defendant; defendant has not established that the state violated any of the discovery rules or failed in any other way to meet its obligations.

■ 4. Defendant next contends that the trial court erred in denying a mid-trial motion for a continuance of 1 or 2 weeks to enable the defense to search for certain witnesses, namely two women who defendant maintained would testify that Kari Stevens told them in jail that defendant had not committed the murder. We hold that the trial court did not err in denying the continuance. Defense counsel had tried for weeks to locate these witnesses; even at this late date defendant has not provided us with any evidence in the form of affidavits that they would have been able to provide material evidence in his defense.

5. Defendant next attacks certain evidentiary rulings by the trial court, arguing that those and other rulings constituted an abuse of office because they were made with the intention of influencing the jury to convict defendant.

Defendant points first to rulings by the court during defense counsel's cross-examination of Michelle Webb, contending that the court erroneously prevented the defense from showing her previous crimes against other people. In fact, however, defendant was allowed to attack her credibility on cross-examination by inquiring into a number of prior crimes by her against various friends.

■ Defendant points next to rulings of the trial court during defense counsel's cross-examination of another witness. Defendant contends that the trial court erroneously prevented the defense from questioning the witness about Michelle Webb's

prior involvement in criminal misconduct to establish that it was Michelle, not defendant, who instigated the discussion of possible crimes during a conversation early in June of 1980. In fact, the trial court said that it was not barring defense counsel from that line of questioning, only from asking his question in such broad terms.

■ In conclusion, there is nothing in the record which supports defendant's contention that the trial court, in its evidentiary rulings or otherwise, tried to influence the jury to convict defendant.

6. Defendant next attacks the adequacy and fairness of the trial court's instructions.

■ First, defendant contends that the court erred in refusing to give an instruction on the state's failure to produce the testimony of Tuck, Gallagher and Kim Stevens. The trial court's refusal was based on the fact that the witnesses in question were not under the state's control and that the state was unable to locate them for defendant's trial. Further, there is nothing to suggest that this testimony would have been unfavorable to the state and favorable to defendant. Under the circumstances, the trial court did not err in refusing to give the instruction in question.

■ Defendant next argues that the trial court should have submitted first- or second-degree manslaughter. The trial court is required to submit lesser-included offenses only if there is a rational basis for the jury to acquit of the charged offense and convict of the lesser offense. Here, however, there was no evidence of heat-of-passion manslaughter and no evidence that defendant acted negligently. Moreover, our decision in *State v. Adams,* 295 N.W.2d 527 (Minn.1980), supports the refusal to submit first-degree manslaughter in the commission of a crime. *Adams* holds that if the underlying felony was a "felony upon or affecting the person," the court need only instruct on felony-murder and need not also instruct on first-degree manslaughter in the commission of a crime. because the jury could not reasonably convict the defendant

of the latter and at the same time acquit him of the former.

■ Finally, defendant contends that the trial court failed to instruct the jury on defendant's theory of the act, by not giving an instruction on withdrawal from a conspiracy under Minn.Stat. § 609.05, which provides in subdivision 3 as follows:

A person who intentionally aids, advises, hires, counsels, or conspires with or otherwise procures another to commit a crime and thereafter abandons his purpose and makes a reasonable effort to prevent the commission of the crime prior to its commission is not liable if the crime is thereafter committed.

Arguably, the trial court should have given an instruction based on this statute. Defense counsel, however, did not request such an instruction and defendant did not testify that he ever withdrew from the conspiracy. Thus, defendant technically could be liable for the felony-murder of the victim under section 609.05, subd. 2, even if he was not present on the night in question.

7. Defendant's next contention is that the trial court prejudicially erred in responding to questions by the jury during its deliberations without notifying defendant and the attorneys.

During its deliberations the jury sent the trial court two handwritten notes. The first read: "Why was Charles Tuck not questioned? Why were blood, hair and saliva samples not taken? Why wasn't his statement even admitted as evidence? Is there any legal reason why he did not testify or his statement [was not] admitted?" The second question read: "If you plan a crime, but do not participate, are you as guilty as those who commit the crime?" The trial court wrote the following answer on the paper containing the first question: "This question cannot be answered by the judge or any of the lawyers?" He wrote the word "yes" on the paper containing the second question.

Defendant argues that by responding as it did, the trial court denied him his right to be present at all stages of the trial. He

contends that a showing of prejudice is not required but submits that even if it is required, he should still be given a new trial because he did suffer prejudice.

Recently, in *State v. Richardson,* 332 N.W.2d 912 (Minn.1983), we were faced with a similar argument. In that case, as here, the trial court responded to two requests by the jury without notifying counsel or allowing counsel to be present. Our opinion, rejecting the argument that no showing of prejudice is required, stated:

> Defendant's other argument in support of his claim that a new trial is required is based on the fact that the trial court responded to two requests by the jury without notifying counsel or allowing counsel to be present. Specifically, when the jury asked to see police reports, the court told the jury that the reports were not in evidence, and when the jury asked for "jury guides," the court provided the jury with a copy of parts of his typewritten instructions and an instruction that if any jurors wanted other parts they could have them. Minn.R.Crim.P. 26.03, subd. 19(2, 3) contemplates that normally the trial court should notify counsel and that any contact with the jury should be in open court. Although this rule was not followed, any error by the trial court clearly was not prejudicial. *State v. Shiue,* 326 N.W.2d 648 (Minn.1982); *State v. Schifsky,* 243 Minn. 533, 69 N.W.2d 89 (1955).

█ The trial court's answer to the first question was inappropriate only if one accepts defendant's contention, already considered herein, that the court should have given an instruction on the state's failure to produce Tuck. Because Tuck was unavailable and the state was under no obligation to call him, we hold that the trial court did not err in refusing to give the instruction. The court's answer to the question presumably would have been the same even if defendant and attorneys had been consulted.

█ Defendant contends that the second question was not the type of question that could be answered by a simple yes or no. We have already dealt with the issue of whether the trial court on its own should have given an instruction on withdrawal as part of its regular instructions. Defendant argues that even if the court did not err in failing to do that, the court did err in simply answering the question with the word "yes." He argues that the question required more than a "yes" or a "no" answer. The state agrees that the answer was over-simplified but argues that it was not a misstatement of the law because a conspirator may be found guilty even if not present. We believe that even if the trial court had given an instruction on withdrawal at this point, the instruction would not have helped defendant because the evidence was overwhelming that defendant had planned the crime and there was no evidence that he ever actually withdrew from the conspiracy. In conclusion, we believe that the court erred in responding to the questions without complying with the rules but we do not believe that the error was prejudicial.

8. Defendant next argues that his trial counsel failed to represent him effectively.

█ At the time of sentencing, defendant made numerous claims of inadequate representation by his trial counsel; he summarized these allegations in 61 pages of handwriting which the trial court received as court exhibits. Defendant's brief on appeal repeats these allegations, arguing that his trial counsel did not prepare adequately, did not obtain available evidence or several relevant witnesses, and did not cross-examine witnesses adequately. We conclude that defendant's trial counsel exercised the customary skills and diligence that a reasonably competent attorney would exercise under similar circumstances. *White v. State,* 309 Minn. 476, 248 N.W.2d 281 (1976).

█ 9. The final issue is whether the sentencing departure was improper. We hold that it was not. Defendant did an immense amount of planning to determine when the victim would be most vulnerable to being robbed. That turned out to be in the victim's backyard late at night. We have recognized as an aggravating circum-

stance the instance where a criminal, in committing a crime such as rape or robbery, invades the zone of privacy that surrounds the victim's home. *State v. Van Gorden,* 326 N.W.2d 633 (Minn.1982), and *State v. Morales,* 324 N.W.2d 374 (Minn.1982). That factor clearly is present here. Additionally, defendant was the ringleader and the "mastermind" of the crime. Weighing all the facts and circumstances, we conclude that the durational departure in this case was justified.

Lastly, defendant in his pro se brief complains that a different judge in revoking a stay of execution of a previously imposed sentence, illegally ordered the sentence to run consecutively to the sentence in this case. That issue is not properly before us on this appeal.

Affirmed.