**STATE of Minnesota, Respondent,**

v.

**Tze THAO, Petitioner, Appellant.**

No. C1–00–2022.

Supreme Court of Minnesota.

Aug. 8, 2002.

Michael C. Davis, (# 20688x), Special Assistant State Public Defender, St. Paul, MN, for Appellant.

Michael A. Hatch, Minnesota Attorney General, Susan Gaertner, Ramsey County Attorney, Darrell C. Hill, (# 45056), Assistant Ramsey County Attorney, St. Paul, MN, for Respondent.

## OPINION

STRINGER, Justice.

A shot fired from a vehicle parked near a basketball court in a public park struck

and killed a basketball player. Following a jury trial, appellant Tze Thao was found not guilty of first-degree premeditated murder but guilty of murder in the second degree while committing a drive-by shooting for the benefit of a gang.[1] The district court imposed an upward durational departure of 1.5 times the presumptive sentence, noting that the number of shots fired, the number of people in close proximity, and the location in which the offense occurred made it significantly more serious than a typical drive-by shooting. The court of appeals affirmed, dismissing appellant's arguments that there was insufficient evidence to support the verdict and that the court had no proper basis for departing from the presumptive sentence. *State v. Thao*, 634 N.W.2d 245, 248–51 (Minn.App.2001). We granted review and now affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

On the evening of September 24, 1999, Zoo Chu Yang Heu (Zoo) was playing basketball on a basketball court adjacent to a parking lot in a public park and playground near the Edgerton School in Maplewood, Minnesota. Zoo was accompanied by six others, five playing on the court with him and another watching the game from a bench nearby. The neighboring basketball court—further removed from the road and parking lot—was also occupied, and there were other people, including children, present in the park and nearby playground at the time. Zoo's friends testified that they noticed a red Toyota Corolla car and a maroon Jeep drive into the parking lot near the basketball courts. The Jeep immediately turned around and left the area, apparently because both basketball courts were in use. The car however, stopped about 10–15 feet from the court where Zoo was playing and

someone in the car asked Zoo and his friends if they were members of the Oriental Loks, a Hmong street gang. Before anyone replied, several gunshots were fired at the basketball court from the window of the car, one striking Zoo. The car sped away and soon after Zoo died of the gunshot wound.

A Maplewood police officer on the west side of the park heard the gunshots around 6:45 to 6:50 p.m. and proceeded to the basketball courts. A second Maplewood police officer arrived shortly thereafter and in the course of his investigation, found eight casings from a small handgun on the ground near the vehicle tracks and discovered three bullet holes at heights between 3'8" and 7'8" in the nearby garages that faced the basketball courts.

A St. Paul police officer working off-duty as a security guard at a Target store heard the police radio broadcast regarding the shooting and recognized the description of the suspected vehicles as those he had seen at the store earlier in the evening. He had been patrolling the store's parking lot on foot when he noticed the vehicles. Because the occupants seemed to be watching him warily, he ran a check of their license plate numbers. Thereafter, he observed two females come out of the store headed for the Jeep carrying a basketball. As the vehicles sped off, he heard a passenger from the car yell back to the Jeep to meet at the playground. He relayed the license plate numbers from the vehicles over the police radio, and when St. Paul Police Officer Richard Straka heard them, he recognized appellant's car. Officer Straka, assigned to the Minnesota Gang Strike Force, believed appellant was a member of a Hmong street gang called the White Tigers and joined in

1. *See* Minn.Stat. §§ 609.19, subd. 1(2); 609.229, subds. 2, 3; 609.66, subd. 1e (2000).

the investigation when it appeared to be gang related.[2]

Later that same night the four occupants of the Jeep were arrested. Three of the occupants testified that appellant drove his car to the park to play basketball after their group purchased a ball at Target. Appellant did not immediately follow when the Jeep they occupied left the park, but when appellant later left, he was driving very fast and they were unable to catch up with him. Appellant showed up at a movie they decided to see and, according to one witness, he said he had shot at the group playing basketball.

Appellant was arrested the next day and initially denied being at the Target store or at the park; he claimed he was out of town hunting during the day and at a movie with his girlfriend later that evening. His girlfriend however, told a different story. She told the police that appellant had driven her to and from school on the day of the shooting and that night she went bowling with some friends. According to her, appellant called around midnight and asked if he could come over. She noticed appellant was "acting a little strange" and testified that he told her "something happened." Appellant asked her to say that she and appellant went out together that night, and that is what she initially told the police when they questioned her.

Appellant continued his efforts to manipulate the testimony of potential witnesses even after incarceration. He maintained communication with his girlfriend, at one point telling her to say that the shooter was actually an acquaintance named "Jimmy." According to a translator who listened to approximately 100 hours of phone calls made by appellant from jail, appellant also contacted many of those present during the shooting in an effort to influence their account of the incident. An inmate in an adjacent cell testified that he overheard a conversation in Hmong in which appellant attempted to relay a message to his sister to hide a .22 caliber handgun "real good" somewhere outside of the house because the police were looking for it.

Eventually the three occupants of appellant's car were also arrested. Initially they all denied knowledge of the incident but one ultimately agreed to talk after being assured that he and his girlfriend, also an occupant, could avoid jail if they told the truth, their stories matched, and the facts could be corroborated. The witness said that he was the front passenger in appellant's car that night and was looking through CDs when he heard shots. When he looked up he saw appellant holding a gun, extending his arm out the window, and shooting at the group playing basketball. His girlfriend, sitting directly behind him, also stated that appellant fired the shots. The third passenger agreed to talk and told police that appellant fired the shots from a .22 caliber handgun that he had seen in appellant's possession on a previous occasion. At trial, all three testified that appellant was the shooter.

The great weight of the testimony of those witnesses present in the park on the night of the incident was that the driver of the car was the shooter. One of the five playing basketball with Zoo testified that the car stopped with the driver's side of the car facing the court, that the driver yelled out at them, and that the driver then looked down, pulled out a gun, and

---

**2.** Officer Straka testified at trial that appellant met at least three of ten criteria used to identify gang members, including associating with known members of the White Tigers and throwing gang signs in photographs with known members of the White Tigers. Four witnesses testifying at trial also confirmed appellant was part of the White Tigers.

shot 6 or 7 times at their group. Although he was unable to pick the driver out of a photo lineup, the witness testified that he was "a hundred percent sure" that the driver of the car was the shooter.

Another witness, claiming he was the closest basketball player to the car, testified that he was looking directly at the driver when the driver aimed a gun at the group and started shooting. A third player on the court with Zoo agreed that the driver's side of the car was facing the court, and testified that only the driver's window was open when he saw a hand come out of the window and fire shots. A witness who was watching the basketball game from a bench testified that she was about 15 feet from the back of the car and confirmed that only one window was open. She testified that she was sure it was the driver who leaned over, pointed a gun out the window, and started shooting at the boys on the court.

A player on the adjacent court testified that he noticed the car come into the playground area and he dropped to the ground when he heard the gunshots. He looked up for "just for a second" from where he was lying about 60 feet away and saw a handgun being brought back into the driver's side of the car, although he was not able to tell if it was actually the driver or the left rear passenger who did the shooting. Another player on the same court, admittedly the farthest away from the vehicle of all the players at about 80–95 feet distant, was the sole defense witness and testified that he "whipped" his head around when he heard the shots, looked for a "split second," and then dove to the ground. Although he acknowledged a

slight vision impairment and was not wearing corrective lenses at the time, he was "positive" that the car was facing in towards the playground and that the gunfire came from the front passenger side.

Appellant elected not to testify. The jury acquitted appellant on the first-degree murder charge but found him guilty of murder in the second degree while committing a drive-by shooting for the benefit of a gang. At sentencing, the court granted the state's motion for an upward durational departure and imposed an executed term of 477 months, a sentence 1.5 times the presumptive sentence.[3] The court cited several factors supporting its conclusion that substantial and compelling circumstances warranted a departure from the presumptive term: the number of people in close proximity, the shots fired directly toward them, the presence of a school and playground in the vicinity, and that people have an expectation of safety in this particular setting. The court acknowledged that there was minimal case law guiding its ruling, but concluded the upward departure was justified because the shooting was significantly more serious than a typical drive-by shooting.

The court of appeals affirmed both the conviction and the sentence, rejecting appellant's argument that the evidence was insufficient to support the verdict because of inconsistencies in the testimony and that the district court had no basis for departing from the sentencing guidelines. *Thao*, 634 N.W.2d at 247, 251. As to the sentencing departure, the court ruled that the park or playground location of the shooting was an aggravating factor as it constituted a "zone of tranquility" where one

---

**3.** Appellant's presumptive sentence was 318 months, the presumptive 306 months for second-degree murder plus an additional 12 months for a crime committed for the benefit of a gang. *See* Minnesota Sentencing Guidelines II.G; Minn.Stat. § 609.229; *see also Thao*, 634 N.W.2d at 249–50. Appellant received custody credit of 340 days and was ordered to pay restitution to the victim's family and the Crime Victims Reparations Board.

would reasonably expect to be safe. *Id.* at 250. In addition, the court determined that the randomness of the shooting, the number of shots fired into the crowd, and the tenuous motivation for the crime were facts showing substantial and compelling circumstances making departure more appropriate than the presumptive sentence. *Id.*

## I.

We first consider appellant's claim that the state's evidence was not sufficient to prove beyond a reasonable doubt that appellant was guilty of second-degree murder. In reviewing a challenge to the sufficiency of the evidence, we review the record in the light most favorable to the conviction to determine whether the evidence reasonably could have permitted the jury to convict. *State v. Webb,* 440 N.W.2d 426, 430 (Minn.1989). We do not retry the facts; we assume the jury believed the state's witnesses and disbelieved the defendant's witnesses. *State v. Moore,* 438 N.W.2d 101, 108 (Minn.1989); *State v. Merrill,* 274 N.W.2d 99, 111 (Minn.1978). If the jury could reasonably have found the defendant guilty of the charged offense, giving due regard to the presumption of innocence and to the state's burden of proof beyond a reasonable doubt, the verdict will not be disturbed. *State v. Johnson,* 568 N.W.2d 426, 435 (Minn.1997).

Appellant claims that the testimony of those in the car with appellant on the night of the shooting is "worthless" because it was the product of improper questioning by police and was induced by threats that they, too, might be charged with a crime. He also discredits the statements that came from Zoo's group, noting that the time of night and speed of the occurrence of events hindered their ability to see the shooter, and that several of them failed to name the driver of the car as the shooter

in their pre-trial statements. He argues that the testimony regarding his activities following the shooting, such as lying about where he was and telling his girlfriend "something" happened, were not tantamount to a confession of guilt and did nothing to rebut the presumption of his innocence.

Summarizing the testimony, the state points out that four witnesses in Zoo's group identified the driver of the car as the shooter. The driver of the car, according to six other witnesses, was appellant, and of those that named appellant as the driver, three—all present at the time of the shooting—also identified appellant as the shooter. The state claims that this identification testimony is reliable because in at least some cases it was quickly forthcoming, and because it came from numerous witnesses who were in the best position to observe the incident. The state also points to other evidence of appellant's guilt including his discredited alibi, his attempts to influence testimony and hide the gun, and his purported confession to one witness shortly after the incident that he was the one who fired the shots at Zoo's group.

We agree with the state that, viewing the evidence in the light most favorable to the verdict, it is sufficient to support appellant's second-degree murder conviction. The only testimony contradicting that of numerous eyewitnesses came from a witness who was standing farthest from the car, had a vision deficiency, and made his identification based upon a "split second" glimpse. Appellant's counsel pointed out the potential weaknesses in the state's witness identification testimony, vigorously cross-examining the witnesses, dissecting the videotaped police interviews and challenging the witnesses' reliability and motivation for testifying as they did—points further emphasized in closing arguments.

As the trial came to an end, jurors were properly instructed that they were the sole judges of the credibility of witnesses and the weight to be given each witness's testimony.

■ We have long recognized that the credibility of a witness is an issue for the jury, as the jury is in the best position to make such a determination. *See State v. Henderson,* 620 N.W.2d 688, 705 (Minn. 2001); *Johnson,* 568 N.W.2d at 435; *State v. Bliss,* 457 N.W.2d 385, 390 (Minn.1990); *State v. Rainer,* 411 N.W.2d 490, 495 (Minn.1987); *State v. Daniels,* 361 N.W.2d 819, 826 (Minn.1985); *State v. Pieschke,* 295 N.W.2d 580, 584 (Minn.1980); *Merrill,* 274 N.W.2d at 111. Further, upon review of a conviction we must assume that the jury considered the testimony and believed the state's witnesses. *Moore,* 438 N.W.2d at 108; *Merrill,* 274 N.W.2d at 111. Here, where numerous eyewitnesses identified appellant as the driver and the shooter, and appellant's own conduct after his arrest weighs heavily toward his guilt, there clearly was sufficient evidence to support his conviction of second-degree murder.

## II.

■ The more difficult question is whether the district court erred by imposing an upward durational departure from appellant's presumptive sentence. The decision to depart from a presumptive sentence under the Minnesota Sentencing Guidelines is within the district court's discretion, *see Rairdon v. State,* 557 N.W.2d 318, 326 (Minn.1996); *State v. Garcia,* 302 N.W.2d 643, 647 (Minn.1981), but when a district court departs from the presumptive sentence, it must articulate "substantial and compelling reasons" justifying the departure, Minnesota Sentencing Guidelines II.D; *see State v. Schmit,* 601 N.W.2d 896, 898 (Minn.1999). Even though the reasons given may be improper or inadequate, if there is sufficient evidence in the record to justify the departure, it will be affirmed. *Williams v. State,* 361 N.W.2d 840, 844 (Minn.1985).

■ The core issue for the district court in determining whether to depart durationally from the guidelines is whether the defendant's conduct was significantly more or less serious than that typically involved in the commission of the crime described in the applicable statute. *State v. Back,* 341 N.W.2d 273, 276 (Minn.1983). Here, the district court found that multiple shots fired into a large number of people in close proximity in a playground location made it significantly more serious than a typical drive-by shooting. The court of appeals agreed, noting that although a playground is not a zone of privacy, it is uniquely held out to the public as a "zone of tranquility," a place where one reasonably expects to be safe from harm. *Thao,* 634 N.W.2d at 250. The court also cited the randomness of the shooting and the tenuous motivation for the crime as factors that made this drive-by shooting atypical justifying a one and one-half times upward departure in sentencing. *Id.* at 250–51.

### A. "Zone of tranquility" as a basis for departure

■ Appellant argues that the court of appeals erred by creating a new "zone of tranquility" departure factor, an improper extension of the aggravating "zone of privacy" factor justifying an upward departure where the crime occurs in a victim's home or curtilage. *See State v. Winchell,* 363 N.W.2d 747, 750 (Minn.1985); *State v. Kindem,* 338 N.W.2d 9, 17–18 (Minn.1983); *see also State v. Morales,* 324 N.W.2d 374, 376–77 (Minn.1982); *State v. Norton,* 328 N.W.2d 142, 146 n. 3 (Minn.1982). Although the court of appeals emphasized that it did not equate a public playground with a crime victim's home, appellant as-

serts that the court's rationale was the same and was discarded by this court long ago in *State v. Mortland,* 399 N.W.2d 92 (Minn.1987). In *Mortland,* the trial court imposed an upward departure in a criminal sexual conduct case in part on a finding that the crime occurred "in a seemingly safe neighborhood park close to the victim's home (which the trial court referred to as within the victim's zone of privacy)." 399 N.W.2d at 95. The court of appeals affirmed that the park was within the victim's zone of privacy. *Id.* at 95 n. 2. We disagreed:

> There may be something about sexually assaulting a child in a neighborhood park that makes the assault more serious, but referring to a public park as within a victim's zone of privacy is to extend the concept of zone of privacy too far.

*Id.* Appellant relies on this language to argue that we have rejected a public park as an aggravating factor to justify an upward durational sentencing departure.

The state, on the other hand, views *Mortland* as supportive of the proposition that a park location increases the seriousness of the offense. It asserts that the court of appeals decision here was a straightforward recognition that a park is like a home—a place where one reasonably would have a lower expectation of being the victim of a crime. *See, e.g., Back,* 341 N.W.2d at 274, 277 ("The victim was a totally innocent person who was in a place [the porch of her home] *where she had every right to expect she was safe.*") (emphasis added). The state goes on to argue that it was appropriate for the district court to recognize the park location as a place where the victim had a right to expect to be safe, and that expectation justified an upward departure from the presumptive sentence. We disagree.

Although we have clearly recognized the commission of a crime in the victim's "zone of privacy" as justifying a more severe punishment, *see Kindem,* 338 N.W.2d at 17–18, we have with equal clarity rejected the inclusion of a public park in that zone. *See Mortland,* 399 N.W.2d at 95 n. 2. While the lower courts are not limited exclusively to the aggravating factors set forth in the guidelines, *see* Minnesota Sentencing Guidelines II.D.2. (indicating that the list of aggravating factors provided in the guidelines is "nonexclusive"), a judicially-created factor must have sufficient definition to be applied in other circumstances. The "zone of privacy" factor, for example, has generally been limited to a victim's home and curtilage. *See Winchell,* 363 N.W.2d at 750.

The "zone of tranquility" factor has *no* such definition. At its outer limits, it is where one would feel serene, at peace, or tranquil—a subjective state, so ephemeral that in the context of a departure from the guidelines, it has little meaning. A place of tranquility for one person might well be a place of stress and anxiety for another. But even if we were to adopt such a factor, it is debatable whether a public park would meet the standard, as judicial notice may be taken that parks are often the scene of serious crimes—perhaps for their characteristics of privacy and remoteness, ironically the same characteristics that might create a sense of peace and tranquility. We also note that it is not unreasonable to conclude that the legislature deliberately chose not to differentiate between various locations of drive-by shootings with regard to punishment when other subdivisions within Minn.Stat. § 609.66 refer specifically to crimes committed in a park. *Compare id.,* subd. 1a(b)(1) (authorizing a more severe penalty for a nondrive-by reckless discharge of a firearm when committed in a park zone) *with id.,* subd. 1e (outlining

penalties for a felony drive-by shooting without consideration of location).

### B. Other bases for departure

 We next consider whether the other factors identified by the lower courts would justify a departure, specifically the indiscriminate firing of multiple shots into a group. Appellant argues that a departure on these facts was an abuse of discretion as they are the predicate facts upon which the presumptive sentence for a drive-by shooting is based. *See State v. Brusven*, 327 N.W.2d 591, 594 (Minn.1982) (holding it was unfair for the trial court to rely upon factors already considered in the presumptive sentence as a basis for a durational departure).

The definitions of the relevant crimes are key to this analysis. Murder in the second degree is defined as:

(1) caus[ing] the death of a human being with intent to effect the death of that person or another, but without premeditation or

(2) caus[ing] the death of a human being while committing or attempting to commit a drive-by shooting in violation of section 609.66, subdivision 1e, under circumstances other than those described in section 609.185, clause (3).

Minn.Stat. § 609.19, subd. 1. Section 609.66, subd. 1e, defines drive-by shooting and provides varying levels of punishment depending on the target:

(a) Whoever, while in or having just exited from a motor vehicle, recklessly discharges a firearm at or toward

another motor vehicle or a building is guilty of a felony and may be sentenced to imprisonment for not more than three years or to payment of a fine of not more than $6,000, or both.

(b) Any person who violates this subdivision by firing at or toward a person, or an occupied building or motor vehicle, may be sentenced to imprisonment for not more than ten years or to payment of a fine of not more than $20,000, or both.

Section 609.185 defines conduct constituting first-degree murder, a charge as to which appellant was acquitted, and includes:

(3) caus[ing] the death of a human being with intent to effect the death of the person or another, while committing or attempting to commit * * * a drive-by shooting * * *.

Appellant focuses on the language of section 609.66, subd. 1e, and argues that by definition a drive-by shooting involves "recklessly discharg[ing] a firearm * * * toward a person [or group of people [4]]," and that this is essentially the conduct cited by the lower courts in support of the upward durational departure. Appellant cites legislative history suggesting that the risk to human life associated with drive-by shootings was exactly what the legislature had in mind when it enacted this statute.[5] Appellant asserts that the legislature sought to make the random discharge of a weapon from a motor vehicle at or toward a group of people a crime, and that because that is what appellant was convicted

---

4. Minnesota Statutes § 645.08(2) (2000) regarding the interpretation of statutes provides that generally, the singular (e.g., person) includes the plural (e.g., people).

5. *See, e.g.*, Hearing on H.F. 178, H. Subcomm. Just. & Fam. L., 78th Minn. Leg., Feb.

17, 1993 (audio tape) (including testimony from proponents of the bill that the drive-by shooter exposes everyone in or near the line of fire to the risk of death or serious injury and essentially terrorizes the "entire neighborhood").

of here, the district court impermissibly relied on the statutory predicates of the crime to support the sentence departure.

It is a close question whether the predicate conduct set forth in the statutory definition of drive-by shooting in section 609.66, subd. 1e, is so similar to the departure factors set forth by the district court, and relied upon by the court of appeals in affirming, that in effect appellant was treated differently than others convicted of this offense because his sentence was enhanced based on offense factors rather than aggravating factors. On balance however, we believe that he was. The words defining the crime are not strikingly different from those of the district court in its rationale for the departure:

- *The firing of the gun.* The drive-by shooting crime relates to the reckless discharge of a firearm. The district court referred in its departure to firing eight shots toward people on the basketball courts but without a specific target. While the facts before the district court most certainly put the statutory definition in context, they did little more than that. Appellant clearly discharged the gun recklessly, but neither the statute nor the legislative history suggests that the random firing of eight shots was so significantly more serious than the statutory reference to a reckless discharge that an upward departure in sentencing is justified.

- *The target.* The crime refers to the discharging of the firearm "at or toward a person." The district court cited appellant's discharge of eight shots toward ten people, unknown to him, and without trying to shoot any particular person. Appellant discharged his firearm toward a person— the victim Zoo—but the others, while certainly endangered by the shooting,

are not dissimilar from those referred to in the legislative hearing as at risk because they are in or near the line of fire. The reliance by the trial court on the ten bystanders at risk, or that they were unknown to appellant, is not a distinguishing feature from the definition of the crime itself to justify a departure.

- *The setting.* The district court also relied on the occurrence of the shooting at the playground near a school and park, and that the setting makes those using the facilities particularly vulnerable because they believed they were in a safe place. This reasoning is based on the same consideration relating to the "zone of tranquility" concept we rejected above and therefore it also fails as support for the sentencing departure.

Appellant's crime was heinous by any standard, but appellant's conduct here was not so different than the offense described in section 609.66 that we can conclude it was "significantly more serious than a typical drive-by shooting," as the trial court ruled and the court of appeals affirmed. We therefore remand for resentencing.

Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.

MEYER, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

GILBERT, Justice (concurring in part and dissenting in part).

I concur with the majority's opinion that there was sufficient evidence to support a second-degree murder drive-by shooting conviction, but respectfully dissent on the remand for sentencing and would affirm the lower court's upward durational departure of 1.5 times the presumptive sentence. There were severe aggravating circum-

stances present with respect to this offense as found by the district court.

The violent act of firing eight shots toward ten people gathered in a public place presents sufficient aggravating circumstances to depart from the presumptive sentence. It is true, as the majority states, that a public park is not traditionally a zone of privacy. *See State v. Mortland*, 399 N.W.2d 92, 95 n. 2 (Minn.1987). Also, I agree that a public park may not necessarily be within a zone of tranquility. However, it is important to move beyond the labels that were used by the lower courts and decide the case on its merits. We must decide whether the district court abused its discretion by ordering an upward durational departure based on appellant's act of firing multiple shots at close range directly toward a number of people attempting to enjoy their freedom in a public gathering place.

If there is sufficient evidence in the record to justify the departure, we are to affirm the sentence. *Williams v. State*, 361 N.W.2d 840, 844 (Minn.1985). It is important to note that although in *Mortland* we held that a public park was not within a victim's zone of privacy, we went on to overturn the court of appeals' reduction of defendant's total sentences and reinstated the district court's sentence. 399 N.W.2d at 95. One of the factors the *Mortland* district court considered was "the fact that the snatching took place in a seemingly safe neighborhood park close to the victim's home." *Id.* While disagreeing with the district court's conclusion that this park was within the victim's zone of privacy, we explicitly referenced the court's recognition that one of the aggravating circumstances was that the crime took place in a seemingly safe neighborhood park before going on to affirm the court's upward durational departure. *Id.* Here, we also have a crime that took place in a

seemingly safe neighborhood park, which was a factor that the district court considered. To do so was not an abuse of discretion.

The majority states that it is a "close question" whether the district court sentenced appellant twice for the same crime but goes on to conclude that appellant's behavior was no different than that which is required to be convicted under Minn. Stat. § 609.66, subd. 1e (2000), which allowed appellant to be convicted of second-degree murder. Notwithstanding the legislative history cited by the majority, the district court did not abuse its discretion in finding that the firing of eight random shots into a group of ten people was significantly more serious than the statutory reference to a reckless discharge. As the majority points out, to be convicted under the drive-by shooting statute one must recklessly discharge a firearm at or toward a person (or toward another motor vehicle or building). *Id.* Here, appellant recklessly discharged a firearm *eight times* at *ten people* in a *public park.* While the majority concludes this is just a typical drive-by shooting, it fails to recognize the varying degrees of recklessness that may exist and the interplay between the drive-by shooting statute and the second-degree murder statute.

Under the relevant statutes, a defendant who recklessly discharges a firearm once from a vehicle toward a single person standing in the middle of the field or vacant parking lot would also be guilty of second-degree murder if the victim died from the gunshot. *See* Minn.Stat. §§ 609.66, subd 1e, 609.19, subd. 1(2) (2000). In fact, a defendant who recklessly discharges a firearm once from a vehicle toward another motor vehicle or building is also guilty of second-degree murder if the bullet happens to kill somebody, even if the defendant thought the motor vehicle

or building was unoccupied. *See* Minn. Stat. §§ 609.66, subd 1e, 609.19, subd. 1(2). Certainly the facts in this case indicate that appellant's level of recklessness was more serious than that in either of the above hypotheticals. There is a dramatic difference in the level of recklessness involved depending on the number of shots fired, the number of people directly in the vicinity of the shooting, and where the shooting took place. Here, eight shots were fired at ten people in a public park—this is sufficient evidence in the record to justify the district court's upward departure. Accordingly, I would hold that the district court did not abuse its discretion and would affirm both appellant's conviction and sentence.