*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1417**

State of Minnesota,
Respondent,

vs.

Devon Derrick Parker,
Appellant.

**Filed October 5, 2016
Affirmed in part, reversed in part, and remanded
Klaphake, Judge**[*]

Hennepin County District Court
File No. 27-CR-14-2958

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Jean Burdorf, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Anders J. Erickson, Assistant Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Larkin, Presiding Judge; Smith, Tracy M., Judge; and

Klaphake, Judge.

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**KLAPHAKE**, Judge

On appeal from his conviction of second-degree intentional murder, appellant Devon Derrick Parker argues that the district court (1) erred in denying his request for a change of venue, and (2) abused its discretion by imposing an upward durational sentencing departure based on the fact that the crime occurred in the victim's zone of privacy. Because the district court acted within its discretion in denying Parker's change-of-venue request, we affirm his conviction; because the district court abused its discretion by imposing an upward durational departure at sentencing, we reverse and remand for resentencing.

## DECISION

### I.      Change of Venue

Parker argues that the district court erred in denying his request for a change of venue. We review a district court's denial of a change-of-venue request for an abuse of discretion. *State v. Blom*, 682 N.W.2d 578, 596 (Minn. 2004).

Minn. R. Crim. P. 25.02, subd. 3, provides that "[a] motion for continuance or change of venue must be granted whenever potentially prejudicial material creates a reasonable likelihood that a fair trial cannot be had. Actual prejudice need not be shown." A case may generate widespread pretrial publicity yet not require a change of venue. *State v. Fratzke*, 354 N.W.2d 402, 406-07 (Minn. 1984). Instead, Minnesota courts consider the publicity's specific nature, timing, and impact on jurors. *Id.* "Pretrial publicity consisting of factual accounts of the crime is insufficient to establish that the publicity was prejudicial." *State v.*

*Warren*, 592 N.W.2d 440, 448 (Minn. 1999). "Moreover, the length of time between the publicity and the trial may mitigate any potential prejudice." *Id.* In *Warren*, the Minnesota Supreme Court affirmed the district court's denial of a change-of-venue request where the defendant "identified approximately 18 pretrial newspaper articles as well as other news reports" about the crime. *Id.* at 447. The supreme court also noted that all but one of the newspaper articles were published approximately nine months before the trial. *Id.* at 448.

Here, the district court denied Parker's request and concluded that there was "not a reasonable likelihood that the publicity of this case would prevent Parker from receiving a fair trial." In arriving at its conclusion, the district court considered the nature and timing of 14 news articles, a script from a television broadcast, and a Hennepin county attorney press conference in which the county attorney referred to the victim as a "Good Samaritan." The district court found as a fact that all of the pre-trial publicity occurred more than a year before the beginning of the trial.

Parker failed to show that any of the pre-trial publicity created a reasonable likelihood of an unfair trial. First, the news stories that Parker submitted mostly recounted the facts of the offense. And even assuming the news stories were inflammatory, the effects of those were mitigated by the passage of time—approximately 14 months—between the publicity and the beginning of Parker's trial. *See State v. Fairbanks*, 842 N.W.2d 297, 303 (Minn. 2014) (concluding that 11 months between the publication of pretrial publicity and the start of trial mitigated any prejudicial effects of 119 articles about the crime); *State v. Moore*, 481 N.W.2d 355, 364 (Minn. 1992) (holding that district court acted within its discretion in denying change-of-venue request where all but one of the news articles were

3

published over a year before the trial). Second, during voir dire, none of the prospective jurors indicated that they knew anything about the case or recognized Parker, suggesting that the publicity that included Parker's name and picture was not immediately impacting their ability to be neutral in considering the facts as presented at trial. Parker argues, however, that because the parties agreed not to use the term "Good Samaritan" during the trial, he was unable to ask prospective jurors about their familiarity with the case. We disagree. Defense counsel could have tested the prospective jurors' familiarity by asking questions concerning the facts of the case without uttering the phrase "Good Samaritan." Parker's counsel made a strategic decision to not ask such questions. Consequently, the record lacks any evidence that jurors were familiar with the case such that Parker would not have received a fair trial.

Parker also argues that the publicity surrounding the Hennepin county attorney's press conference created a reasonable likelihood that Parker would not receive a fair trial, warranting a change of venue. Because Parker did not raise this argument to the district court, he must show that there was plain error affecting his substantial rights. *See State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998) (reviewing unobjected-to errors for plain error). Although we have some concerns about this press conference, there is no evidence that it impacted the fairness of Parker's trial. As stated above, Parker's trial counsel never asked any of the prospective jurors about their exposure to the facts of the case. Without record evidence that Freeman's press conference actually prejudiced Parker's opportunity for a fair trial, Parker's argument concerning the press conference is without merit.

Additionally, to the extent that Parker argues that the county attorney's comments at the press conference or in other pretrial statements constituted prosecutorial misconduct, we also normally decline to hear such claims when they are raised for the first time on appeal. *State v. Ramey*, 721 N.W.2d 294, 297 (Minn. 2006). But even if some of the prosecutor's comments spoke too much to Parker's case in the media before trial because of discussion of his character or the merits of the case, *see, e.g., State ex rel. v. Tahash*, 284 Minn. 365, 370, 170, N.W.2d 445, 448 (1968), Parker has failed to show that any such prosecutorial misconduct affected his substantial rights under *Griller*. 583 N.W.2d 740; *see also In re Disciplinary Action against Michael*, 836 N.W.2d 753, 765 (Minn. 2013) (explaining that it is the supreme court's "ultimate responsibility to determine what discipline, if any, is appropriate" in attorney-misconduct cases).

The district court acted within its discretion in denying Parker's change-of-venue request because Parker has not shown that he was prejudiced, and Parker has not demonstrated prejudice to support his claim of prosecutorial misconduct due to excessive media coverage prior to trial.

## II.     Upward Durational Departure

Parker argues that the district court abused its discretion by imposing a sentence that constituted an upward durational departure from the presumptive sentence. The district court imposed a 480-month sentence, which included a 366-month period imposed as the presumptive sentence and an additional 114 months as an upward durational departure. This court generally reviews an upward departure from a presumptive sentence for an abuse of discretion. *State v. Jackson*, 749 N.W.2d 353, 356-57 (Minn. 2008). The question of

5

whether the district court's reason for departure is proper is a legal issue that we review de novo. *Dillon v. State*, 781 N.W.2d 588, 595 (Minn. App. 2010), *review denied* (Minn. July 20, 2010). If the reason given by the district court justifies the departure, the departure will be allowed. *Williams v. State*, 361 N.W.2d 840, 844 (Minn. 1985). If the reason given is improper or inadequate and there is insufficient evidence to justify the departure, the departure will be reversed. *Jackson*, 749 N.W.2d at 357.

The sentencing guidelines contain a nonexclusive list of aggravating factors that may justify an upward durational departure. Minn. Sent. Guidelines 2.D.2.b (2014). One reason for imposing an upward departure is that the defendant committed the crime within a victim's zone of privacy. *State v. Kindem*, 338 N.W.2d 9, 17-18 (Minn. 1983). The zone of privacy often includes a victim's home, particularly when the offender enters the home by force. *State v. Thao*, 649 N.W.2d 414, 421 (Minn. 2002); *State v. Winchell*, 363 N.W.2d 747, 750 (Minn. 1985). But the zone of privacy does have limits, and the supreme court has declined to extend the zone of privacy to other places of "tranquility," such as parks. *Thao*, 649 N.W.2d at 421.[1]

The district court identified the sole factor of invasion of the victim's zone of privacy in granting the upward durational departure here. But the record included uncontradicted testimony that the armed victim, T.S., permitted Parker to enter his kitchen after Parker knocked on the door for help, locked the door with a key after Parker entered,

---

[1]Parker argues that the zone-of-privacy factor does not apply in homicide cases or in cases when the defendant does not trespass in the victim's home. In *State v. Bock*, 490 N.W.2d 116, 121 (Minn. App. 1992), *review denied* (Minn. Aug. 27, 1992), we expressly rejected this argument.

6

ordered him to sit in a room that contained other loaded weapons, and refused to let him leave the home despite Parker's requests to do so. The district court did not consider how these facts impacted application of the zone-of-privacy factor. "The core issue for the district court in determining whether to depart durationally from the guidelines is whether the defendant's conduct was significantly more or less serious than that typically involved in the commission of the crime." *Thao*, 649 N.W.2d at 421. *See Ture v. State*, 353 N.W.2d 518, 525 (Minn. 1984) (stating that justification for an upward sentencing departure is dependent upon "whether [the] defendant committed the crime in question . . . in a particularly serious way"). The zone-of-privacy factor is less persuasive when the conduct that precedes the crime includes that the defendant is held in the home against his will by the victim. *See* Minn. Sent. Guidelines 2.D (requiring "substantial and compelling" circumstances to justify a sentencing departure).

Further, the district court must balance aggravating factors against any mitigating factors in determining whether to depart, and the failure to do so is error. *State v. Curtiss*, 353 N.W.2d 262, 264 (Minn. 1984). The sentencing guidelines contain a nonexclusive list of mitigating factors that include aggression of the victim, duress of the offender, and "substantial grounds" that otherwise excuse or mitigate the offender's conduct, although falling short of a defense. Minn. Sent. Guidelines 2.D.3 (2014); *see State v. Larson*, 473 N.W.2d 907, 910 (Minn. App. 1991) ("The sentencing guidelines acknowledge victim aggression and duress as valid mitigating factors."). A mitigating factor should not be "ignored" in considering whether a "defendant's conduct [is] particularly deserving of punishment." *State v. Wall*, 343 N.W.2d 22, 25-6 (Minn. 1984) (modifying upward

7

durational departure to a presumptive sentence when the district court considered aggravating factors but failed to consider the mitigating factor of a defendant's mental illness). Even one mitigating factor may support a downward durational departure. *State v. Solberg*, 882 N.W.2d 618, 624-25 (Minn. 2016).

The district court summarily rejected Parker's mitigation argument, including that the offense occurred while Parker was under duress. The district court said that this argument, and the argument that the victim was an aggressor, were "arguments that the jury did not accept, so I don't either." (S.T. at 63) This summary rejection of the mitigation argument was improper. First, the guilty verdict does not signify that the jury concluded there were no mitigating facts surrounding the offense; it signifies only that Parker was culpable for the crime and that he did not have a defense that excused his culpability. Second, the trial record includes evidence of mitigation which the district court ignored. The record establishes that T.S.'s home was very well protected: the home had bolt locks on the doors that required a key for entry and egress, and the home contained what can only be described as an arsenal of over 50 weapons placed about the home. According to T.S.'s wife E.S., T.S. carried a gun on him "at all times" and did not leave the home very often because he was afraid to do so, and it was "disconcerting" to her that there were guns located throughout the house. On the late morning of the murder, T.S. was wearing his revolver holstered on his hip. Parker knocked on T.S.'s kitchen door claiming he was in danger, and entered the home with T.S.'s permission. A 911 operator was called to report that Parker was in danger.

According to the trial testimony of both Parker and E.S., who was located in the dining room and could only hear what occurred in the kitchen, T.S. relocked the door immediately after Parker entered the home. According to both Parker and E.S., T.S. ordered Parker to sit and refused to let him out of the house even when he asked to leave. E.S. testified that Parker asked to leave once and "may have" asked to leave a second time; Parker testified that he twice asked to leave. E.S. testified that shortly after the 911 call she heard a click which she knew was the cocking of a revolver, and fifteen seconds later she heard a gunshot. Parker testified that T.S. had pointed his gun at him, and he thought that T.S. was going to shoot him. This was the testimony regarding the circumstances that preceded the struggle during which Parker overpowered T.S. and shot him with his own gun.

Under the unique circumstances of this case, the failure of the district court to consider all of the circumstances that affected application of the zone-of-privacy factor, and the failure to consider any mitigating circumstances present in the record, amounted to an abuse of discretion. *Jackson*, 749 N.W.2d at 357; *Wall*, 343 N.W.2d at 25-6. We therefore reverse the aggravated portion of Parker's sentence and remand for imposition of the presumptive 366-month sentence. *See id.*, 749 N.W.2d at 357 (requiring reversal and remand for imposition of the presumptive sentence when the given departure reasons are "improper or inadequate").

**Affirmed in part, reversed in part, and remanded.**