**STATE of Minnesota, Respondent,**

v.

**Thomas Walter BOCK, Appellant.**

**No. C6–91–1200.**

Court of Appeals of Minnesota.

July 21, 1992.

Review Denied Aug. 27, 1992.

Hubert H. Humphrey, III, Atty. Gen., Mary J. Theisen, Sp. Asst. Atty. Gen., St. Paul, Richard S. Roberts, Traverse County Atty., Wheaton, for respondent.

John M. Stuart, State Public Defender, Susan L.P. Hauge, Asst. State Public Defender, Minneapolis, for appellant.

Considered and decided by CRIPPEN, P.J., and SCHUMACHER and SCHULTZ,[*] JJ.

## OPINION

SCHUMACHER, Judge.

Appellant Thomas Walter Bock was indicted for second degree intentional murder in violation of Minn.Stat. §§ 609.19(1) and 609.11 (1990); second degree felony murder in violation of Minn.Stat. §§ 609.19(2), 609.-222, 609.11 (1990); and two counts of second degree arson in violation of Minn.Stat. § 609.562 (1990) for the events surrounding the death of Steven Young. Following a jury trial, Bock was found guilty of all charges. He was sentenced to concurrent terms of imprisonment of 370 months, 30 months, and 34 months. We affirm.

## FACTS

Bock was a friend of E.D. beginning in high school in Wheaton, Minnesota and continuing in college in the Fargo–Moorhead area. Although the two did not have a romantic relationship, Bock became obsessed over E.D. and her relationship with the victim, Steven Young.[1] E.D. had begun dating Young in the spring of 1990. During the summer of 1990, several incidents of harassment occurred against E.D. and Young.

On June 19, 1990, E.D. arrived at her job at the Wheaton swimming pool to find

---

[*] Retired judge of the district court, acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

1. Evidence was presented at trial suggesting that Bock had exhibited jealousy towards two other men E.D. had dated.

graffiti referring to her as a "slut" painted on the walls and door. On July 6, similar slogans were painted at the pool and on the highway which E.D. followed to work.

In addition to the graffiti, several incidents of harassment occurred when E.D. was visiting Young at his house in Wheaton. One night, an anonymous caller pounded on the front door. When Young turned on the porch light, no one was there. On another night after someone pounded on Young's front door, he found concrete blocks stacked in front of the door. Young kicked the door open and chased the person on his motorbike. The next morning, E.D. found an anonymous obscene note on the windshield of her truck. On another night, E.D. saw someone looking into the window at Young's house. Young ran outside and chased the person but did not catch him. In addition, on the evening of October 28, when E.D. tried to leave Young's house, she found that the tires on her truck had been slashed.

On October 31, Young worked until approximately 8 p.m., then went home for the rest of the evening. A close friend of Young's visited him for approximately an hour at 9 p.m. At 4:23 a.m. on November 1, a Wheaton police officer received information regarding fires at Main Street Motors, owned by Young's brother. Two pickup trucks and two cars were on fire. The officer then received a call about a second fire at a vacant house in Wheaton. Later that morning, he stopped at Young's house due to reports of graffiti. After seeing the obscene graffiti on the side of Young's house, the officer knocked on the front door. He noticed a broken window on the door and blood splattered on the ground. No one responded to his calls.

The officer returned to Young's house with Young's brother and his wife. They saw blood splattered in the kitchen and bathroom. They found Young wearing only a blue t-shirt curled up in the fetal position in his bed. On the left side of Young's head was a laceration partially covered by a bandage. Young was moaning, drooling, and could not speak. He was transported to a Fargo hospital, where brain surgery was performed. Young did not regain consciousness and was declared dead on November 6. According to the autopsy report, Young died of injuries due to blunt trauma to the head. Young had skull fractures on both sides of his head.

E.D. mentioned Bock's name to agents from the Bureau of Criminal Apprehension. The agents and a Fargo Police Department detective went to Bock's apartment in Fargo to talk to him. Bock eventually admitted to slashing Deal's tires, spray painting the graffiti around town, and assaulting Young.

Bock told the agents that he left Fargo around 11 p.m. on October 31, drove to Wheaton, and parked in a tree grove outside of town. He took a black garbage bag, packed with a knife, baseball bat, spray paint, and magic marker and ran into town where he hid the bag in an abandoned building near Young's house. Then he broke into a shop and took a cordless drill. He returned the drill after drilling holes in the gas tanks of several vehicles at Main Street Motors.

After retrieving the garbage bag, Bock painted graffiti on the side of Young's house. He hid the bag next to some nearby grain bins and watched Young's house from the abandoned building. He then used his bat to break the front door window of Young's house and ran past the house until Young came outside.

Bock said that he unintentionally "tapped" Young above the left eyebrow with his bat as a reflex action. He stated that he did not believe that he had hit Young hard. Young fell to the ground and began moaning. Once Young got up, Bock ran by him again and grazed him with his shoulder. Bock said that Young hollered like he was scared and tried to chase him, but Bock ran away. Bock then set the abandoned house on fire and ignited the vehicles at Main Street Motors. He grabbed his bag, left Wheaton, and cleaned up for work when he arrived back in Fargo at about 6:10 a.m.

Agents later found the black garbage bag Bock had brought with him to Whea-

ton. The bag contained many of the supplies Bock had used as well as two crumpled sheets of paper on which he had outlined his plans. Bock's plans closely followed the events which actually occurred. He had planned to go to Young's house with his bat, spray obscenities on the house, break a window on the house, and hide and wait by some bushes. He planned to hit Young on the side of the head with his bat, spray paint or insect repellant in Young's eyes, hit Young again if he had to, wire Young's arms and legs, tape his mouth, and burn his "cock" with gas or insect repellant.

## ISSUES

1. Is the evidence of intent sufficient to sustain Bock's conviction for second degree intentional murder?

2. Did the sentencing court abuse its discretion in departing upward from the presumptive sentence for second degree intentional murder?

3. Was the sentencing court's apparent failure to provide notice of its intent to depart from the presumptive sentence prejudicial?

4. Did the trial court abuse its discretion in allowing autopsy photographs of the victim's upper body into evidence?

5. Was Bock denied effective assistance of counsel at trial?

## ANALYSIS

1. Bock maintains the evidence was insufficient to prove that he killed Young intentionally. The surrounding circumstances, however, support a finding of intent consistent with second degree murder.

■ In reviewing the sufficiency of the evidence to support a criminal conviction, an appellate court must make a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did. *State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989). Second degree intentional murder includes when a person

causes the death of a human being with intent to effect the death of that person or another, but without premeditation.

Minn.Stat. § 609.19(1) (1990). The phrase "with intent to" means

that the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result.

Minn.Stat. § 609.02, subd. 9(4) (1990). Because intent is a state of mind, it is generally determined by inferences drawn from the person's words or actions in light of all the surrounding circumstances. *State v. Hardimon*, 310 N.W.2d 564, 566 (Minn. 1981).

■ The nature of Young's injuries and the severity of the blows to his head are evidence of Bock's intent to kill Young. Bock told the police that he merely "tapped" Young on the head and did not intend to inflict serious harm. The medical evidence shows to the contrary. *See State v. Lundstrom*, 285 Minn. 130, 140, 171 N.W.2d 718, 724–25 (1969) (defendant's statements as to his intentions not binding on jury if his acts demonstrate a contrary intent). The medical examiner testified that her examination indicated two separate, severe blows were inflicted to Young's skull. She states the laceration to Young's head was consistent with "a full swing of the bat from over the shoulder down on top of the head" with the bodily "force of an adult." According to her examination, the skull fractures also appear to have resulted from a great deal of force.

Bock's failure to seek assistance for Young also indicates intent to cause death. Bock left Young in his yard with at least two severe blows to his head. Bock told police that Young fell to the ground, moaning and dazed after the first blow. The medical examiner's testimony establishes that Young sustained a serious laceration to his head as a result of the blows. The photographs of Young's house depict blood splattered from his front door to the bathroom and bedroom. Despite Young's apparent inability to recognize the severity of his own injuries, the circumstances indicate

Bock should have been alerted to seek medical assistance for Young. *See State v. Raymond*, 440 N.W.2d 425, 426 (Minn. 1989) (leaving severely bleeding victim supports finding of intentional murder). Instead, Bock's subsequent actions that night, i.e. his acts of arson, illustrate an attempt to divert law enforcement officers' attention from the incident at Young's house.

Bock's written plans also indicate he was capable of forming the requisite intent. Bock, however, did not carry out his plan to attack Young beyond hitting him on the head with a bat. Bock claims he voluntarily abandoned his plan and decided he did not want to seriously harm Young. Other evidence suggests Bock did not have all of his supplies with him to carry out the plan. In any event, Bock's preparations for the assault and act of bringing a baseball bat also support a finding of intent to cause Young's death. *Compare State v. Campbell*, 281 Minn. 1, 13, 161 N.W.2d 47, 55 (1968) (preparations for robbery and bringing of loaded gun supported finding of intent).

Under the facts presented, the evidence of intent is sufficient to sustain his conviction for second degree murder.

2. Bock was sentenced to a term of imprisonment of 370 months for his conviction of second degree intentional murder. This is a 64–month upward durational departure from the presumptive sentence of 306 months. Bock argues the circumstances of this case do not justify a departure. We disagree.

■ The sentencing court has broad discretion to depart from the presumptive sentence only if there are aggravating circumstances. *State v. Best*, 449 N.W.2d 426, 427 (Minn.1989). The court shall use the presumptive sentence unless there are "substantial and compelling" circumstances. Minn. Sent. Guidelines II.D. "Substantial and compelling circumstances are those circumstances that make the facts of a particular case different from a typical case." *State v. Peake*, 366 N.W.2d 299, 301 (Minn.1985).

■ Here, the sentencing court based its departure on these circumstances: (A) the victim was particularly vulnerable; (B) the assault occurred within the victim's zone of privacy; and (C) the victim was killed in a particularly cruel manner. The record supports these grounds for departure.

First, the evidence illustrates Bock spent a great deal of time planning to attack Young when he was alone in the middle of the night, a time when he was most vulnerable. *See State v. Kindem*, 338 N.W.2d 9, 17 (Minn.1983), *cert. denied*, 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984) ("immense amount of planning to determine when the victim would be most vulnerable" considered an aggravating factor warranting departure). Additionally, the testimony of both Bock and the medical examiner indicate Young fell from the impact of the first blow. Young therefore was dazed and in a vulnerable condition when Bock hit him the second time.

Second, the assault occurred in Young's own front yard. Bock argues the policy behind classifying a crime committed in the victim's home as an aggravating circumstance is not a valid concern in a homicide case. We disagree. Violation of the victim's zone of privacy does not focus on only the victim's future fear but also encompasses the fact that the violator deliberately trespassed in a place where the victim felt particularly safe. *See State v. Back*, 341 N.W.2d 273, 277 (Minn.1983) (invasion of victim's home was an aggravating factor warranting departure in a felony-murder because victim "was a totally innocent person who was in a place where she had every right to expect she was safe").

Third, Young was killed in a particularly cruel manner. As the sentencing court noted, Bock broke a window of Young's house to coax him outside, struck him with a baseball bat, watched him fall to the ground dazed, and then grazed his body and hit him again when he stood. Furthermore, Bock harassed Young and E.D. only two nights before the killing. *Compare State v. Campbell*, 367 N.W.2d 454, 461 (Minn.1985) (rape days prior to murder and coming back to victim's apartment consid-

ered "psychological terror which [preceded] and [was] part of the murder").

Under these circumstances, the aggravating factors listed by the sentencing court support an upward durational departure.

■ 3. Bock also argues the trial court gave no notice of its intent to depart durationally from the guideline's sentence, thus depriving him of an opportunity for rebuttal on the departure. We find that under the facts and circumstances of this case, Bock had notice of the trial court's consideration of departing from the presumptive sentence and had ample opportunity to rebut the departure.

Minn.R.Crim.P. 27.03, subd. 1(A)(4) delineates certain notice requirements:

> If the facts ascertained * * * through trial cause the judge to consider departure from the sentencing guidelines appropriate, the court shall advise counsel of such consideration.

Furthermore,

> If departure from the sentencing guidelines appears appropriate, and the court has not previously notified the parties or counsel for the parties that the court is considering departure, the court shall forward notification of such consideration at the time the sentencing worksheet and any presentence investigation report is forwarded.

Minn.R.Crim.P. 27.03, subd. 1(C).

The record does not indicate the trial court advised Bock or his counsel that departure from the sentencing guidelines was under consideration either after trial or at the time the presentence investigation report was forwarded. However, no objection to the trial court's lack of notice to depart appears on the record.

Under the facts of this case, we do not find this omission to be prejudicial. The state filed a notice of motion and motion for upward durational departure with a supporting memorandum on February 6, 1991, nearly two months prior to the sentencing hearing on April 4. The state reiterated its request for an upward durational departure when defense counsel moved for sentencing in accord with the presentence

investigation which recommended the presumptive sentence. We find these circumstances put Bock on notice that the trial court was considering departing from the sentencing guidelines. Moreover, no requests for a continuance to prepare for the sentencing hearing were made.

Bock also contends he was not given a copy of the sentencing worksheet and nonconfidential portion of the presentence investigation report. The record, however, indicates Bock's attorney was given a copy of the worksheet and report. Bock's contention therefore is without merit. *See* Minn.R.Crim.P. 27.03, subd. 1(C) ("the court shall cause a copy of the sentencing worksheet and the nonconfidential portion of the presentence investigation report, if any, to be forwarded to * * * the defendant *or* defense counsel") (emphasis added).

4. Bock argues photographs of Young's upper body after his organs had been removed for donation were more prejudicial than probative. He also claims they were irrelevant because Young only sustained injuries to the head. We find these photographs were relevant to several material issues and, in any event, did not substantially influence the jury to convict.

■ Admission of photographs taken at the autopsy of a murder victim is a matter in the discretion of the trial court and will not be reversed absent a showing of clear abuse of that discretion. *State v. Olson,* 436 N.W.2d 817, 820 (Minn.App.1989), *pet. for rev. denied* (Minn. Apr. 26, 1989), *cert. denied,* 493 U.S. 862, 110 S.Ct. 176, 107 L.Ed.2d 132 (1989). The general rule is:

> Photographs are admissible as competent evidence where they accurately portray anything which is competent for a witness to describe in words, or where they are helpful as an aid to a verbal description of objects and conditions, provided they are relevant to some material issue; and they are not rendered inadmissible merely because they vividly bring to jurors the details of a shocking crime or incidentally tend to arouse passion or prejudice.

*State v. Hummel,* 483 N.W.2d 68, 74 (Minn.1992) (citing *State v. Alton,* 432 N.W.2d 754, 758 (Minn.1988)); *see also Olson,* 436 N.W.2d at 820 (citing Minn.R.Evid. 403; *State v. Sanders,* 376 N.W.2d 196, 200 (Minn.1985); *State v. DeZeler,* 230 Minn. 39, 40, 46–47, 41 N.W.2d 313, 319 (1950)).

■ While Young's injuries were confined to his head, photographs of Young's upper body were helpful to the medical examiner in explaining her testimony. The autopsy photographs accurately portrayed the signs of medical intervention which the medical examiner described, especially the neurological tests to determine brain death. They also depicted a lack of defensive injuries on Young's arms, indicating that he did not incur injuries in trying to protect himself. The lack of defensive injuries is suggestive of Young's inability to fend off subsequent blows. The photographs were relevant to several material issues. However, they arguably should have been excluded because their probative value was "substantially outweighed by the danger of unfair prejudice." Minn.R.Evid. 403; *see Sanders,* 376 N.W.2d at 200 n. 2 ("[T]he word 'prejudice' * * * 'refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means.'") (quotation omitted).

■ A nonconstitutional evidentiary error, however, is harmless unless it substantially influences the jury to convict. *See State v. Carlson,* 268 N.W.2d 553, 561 (Minn.1978) (testimony regarding defendant's clothing erroneously admitted). The strength of the state's case is one factor to consider in making this determination. *Id.* Here, only 2 of the 10 autopsy photographs showed Young's upper body; the other photographs depicted his head injuries. Additionally, the jury was told that the stitches and bruises on Young's body were not injuries caused by Bock. In closing argument, the state only referred to the photographs illustrating the head injuries Young received.

Given the extensive evidence justifying the jury's verdict, we conclude the arguable evidentiary error was harmless. The trial court did not abuse its discretion in admitting these photographs.

■ 5. Bock maintains he was denied effective assistance of counsel because his trial counsel initiated very little contact with him prior to trial; failed to keep him adequately apprised of pretrial preparation and possible defenses; and made very few attempts to talk to any witnesses or call character witnesses. His bare allegations, however, do not reach the level of proof necessary to show ineffective assistance of counsel:

> The defendant must affirmatively prove that his counsel's representation "fell below an objective standard of reasonableness" and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." "A reasonable probability is a probability sufficient to determine confidence in the outcome."

*Gates v. State,* 398 N.W.2d 558, 561 (Minn. 1987) (quoting *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)).

## DECISION

The evidence presented was sufficient to sustain a conviction for second degree intentional murder. There was no abuse of its discretion in departing upward from the presumptive sentence when aggravating factors existed. The sentencing court's apparent failure to provide notice of its intent to depart from the presumptive sentence was not prejudicial. No abuse of discretion occurred in admitting the autopsy photographs. Bock did not affirmatively prove that he was denied effective assistance of counsel at trial.

Affirmed.