STATE of Minnesota,
Respondent/Cross-
Appellant,

v.

Devon Derrick PARKER,
Appellant/Cross-
Respondent.

A15-1417

Supreme Court of Minnesota.

Filed: October 4, 2017

918

Lori Swanson, Attorney General, Saint Paul, Minnesota; and Michael O. Freeman, Hennepin County Attorney, Jean Burdorf, Assistant Hennepin County Attorney, Minneapolis, Minnesota, for respondent/cross-appellant.

Cathryn Middlebrook, Chief Appellate Public Defender, Anders J. Erickson, Assistant State Public Defender, Saint Paul, Minnesota, for appellant/cross-respondent.

## OPINION

HUDSON, Justice.

Following a jury trial, appellant/cross-respondent Devon Derrick Parker was convicted of second-degree intentional murder and sentenced to 480 months in prison, which reflected an upward durational departure from the presumptive range of 312 to 439 months. On appeal, Parker challenged his conviction, arguing both that the district court erred when it denied his motion for a change of venue and that the prosecutor committed misconduct during a pretrial press conference. Parker also challenged his sentence, arguing that the district court abused its discretion by imposing an upward durational sentencing departure. The court of appeals affirmed the conviction, but reversed the sentence and remanded for resentencing. We affirm the court of appeals' decision to uphold Parker's conviction, but disagree with its conclusion that the district court abused its discretion when it imposed an upward durational departure. We therefore affirm in part and reverse in part.

## FACTS

On the morning of January 31, 2014, Devon Parker rang the doorbell of the back door of a residence in north Minneapolis where Thomas Sonnenberg lived with his wife. After Parker yelled "guys are chasing me" and "trying to kill me," Sonnenberg unlocked the back door and Parker entered the Sonnenbergs' home.

The Sonnenbergs, very concerned about the security of their home, had deadbolts on their doors that locked from either side, meaning that without a key, a person could neither enter nor exit the house. The day that Parker entered the Sonnenberg residence, Sonnenberg, as was his customary practice, had a loaded revolver holstered on his hip for protection. There were two other guns in the kitchen.

After Parker entered his home, Sonnenberg dialed 911. Sonnenberg explained to the 911 operator that Parker had shown up at the back door, "said that he needed help[,] and charged into" the kitchen once the door was unlocked. During the call, Sonnenberg told the operator that Parker believed people were chasing him. The operator assured Sonnenberg that "help [was] on the way" and planned to "stay on the phone" until the officers arrived. However, Parker then got on the line and said someone was trying to break into his

brother's house at "3708 Bryant."[1] The call ended abruptly after Parker said, "Please come on now. Please." Parker understood at the time of the 911 call that Sonnenberg was trying to help him.

After the 911 call ended, Parker asked Sonnenberg to let him out of the house, which was only possible with a key. Sonnenberg's wife, out of sight in the adjoining dining room, heard Sonnenberg respond by telling Parker that the police were on their way and that he would be safe where he was. Parker became uncomfortable when he realized that Sonnenberg kept multiple guns in his house and that Sonnenberg would not allow him to leave despite his requests. Sonnenberg's wife heard Parker ask Sonnenberg for coffee and a cigarette, to which Sonnenberg did not respond, and after a period of silence, Parker began counting, "One, two, three, four ..." like he was "trying to scare" Sonnenberg. She then heard a click and, later, a gunshot. Parker claims that he heard the "click" when Sonnenberg was in control of the gun, so he disarmed Sonnenberg and directed him to sit at the kitchen table and wait for the police. According to Parker, Sonnenberg complied, but later made a sudden movement that caused Parker to fear for his life.

It is undisputed that Parker fatally shot Sonnenberg in the forehead. Parker then entered the dining room, saw Sonnenberg's wife for the first time, forced her upstairs, and ordered her to find a key so Parker could leave the house. A short time later, the police arrived and arrested Parker.

The State charged Parker with several offenses, including second-degree intentional murder, Minn. Stat. § 609.19, subd. 1(1) (2016). That same day, on February 3, 2014, the county attorney held a press conference during which he announced the charges against Parker and answered questions from the media. In his introduction, the county attorney commented on Sonnenberg's character, referring to him as a "fine man" and "a Good Samaritan who is doing what we always hope people do ... help others." In addition to Sonnenberg's character, the county attorney mentioned Parker's prior record and sentencing history, saying, "Parker had a prior record of more minor crimes: obstruction with force; fifth-degree assault; interference with an MTC bus driver, but nothing significant. He had done time in the past, and ironically, he was supposed to appear on Friday, the day this incident occurred, in Hennepin County District Court to be sentenced on another crime." Finally, the county attorney twice alluded to Parker's constitutional right against self-incrimination. He stated, in response to a question from the press, that "Apparently Parker knows people in the neighborhood, but we don't know because the only person who really knows that is Parker, and he's not talking." Similarly, in response to a question about Parker's possible motive, the county attorney commented, "Our dilemma always is, the defendant's got his constitutional right not to talk, he's the one who can answer these questions frankly better than I can."

The county attorney's office later posted the video of the press conference to its YouTube page, referring to Sonnenberg as a "Good Samaritan" in the title of the video. *See* HennepinAttorney, *Man Charged in Murder of Good Samaritan*, YouTube (Mar. 3, 2014), https://www.youtube.com/watch?v=hIuNHNjuQHA. The media subsequently ran stories using

---

1. The police initially responded to this nonexistent address instead of the Sonnenberg residence. Parker later testified that he misspoke when reciting his brother's address.

the same "Good Samaritan" phrase.[2]

In April 2015, over a year after the charging and press conference, Parker filed a motion to change venue under Minn. R. Crim. P. 25.02, which provides that a "change of venue must be granted whenever potentially prejudicial material creates a reasonable likelihood that a fair trial cannot be had." Minn. R. Crim. P. 25.02, subd. 3. At the motion hearing, Parker described the local media reports as a "feeding frenzy" that amplified the prosecutor's comments about Sonnenberg's character by consistently using the phrase "Good Samaritan," which, according to Parker, had eliminated the possibility of a fair trial. The State urged the district court to deny Parker's motion to change venue. Citing *State v. Moore*, 481 N.W.2d 355, 364 (Minn. 1992) (affirming the denial of a motion to change venue where the 1-year-old news coverage was factual in content and the parties had an opportunity to question potential jurors about any exposure to publicity during voir dire), the State argued that a fair trial was possible because more than a year had passed since the media last reported on Parker's case. Parker did not directly object to the prosecutor's statements at the pretrial conference or argue that they constituted misconduct.

The district court denied Parker's motion to change venue. The court made clear that its "primary reason[s]" were both the "age of the publicity," which it concluded would "go pretty far in reducing any prejudice that resulted from it, if any did"; as well as the upcoming voir dire, which "could certainly weed out those who have been affected." The court continued, "most of the media that was cited in the motion was media that is repeated or published on the internet." The court determined that because the allegedly prejudicial articles were published on the internet, "people in every corner could have been exposed to it so I'm not sure where in Minnesota someone would not have been exposed to [it] if the material was prejudicial, where we would move venue, given the type of coverage." Parker subsequently filed a motion in limine, requesting that the State be prohibited at trial from referring to Sonnenberg as a "Good Samaritan." The State did not oppose the motion, and the district court granted Parker's request.

During voir dire, the district court recited the charges against Parker and then asked the potential jurors: "Does anybody think they know anything about this case? If so, raise your hand." No prospective jurors raised their hands. After introducing Parker and having him stand for the potential jurors, the court asked: "Does anyone believe they know [Parker] or perhaps heard of him?" Again, no prospective jurors raised their hands. Defense counsel did not ask any questions about pretrial publicity or the pretrial press conference.

Following trial, the jury found Parker guilty of second-degree intentional murder. The jury, as part of its verdict, affirmatively answered a special interrogatory

2. *See, e.g., Charges Filed in Minneapolis Good Samaritan Killing*, MPR News, Feb. 3, 2014; Crimesider Staff, *Cops: Minn. Man Kills Good Samaritan Trying to Help Him*, CBS/AP, Feb. 4, 2014; Maury Glover, *Charges: Good Samaritan Shot with Own Gun in Minneapolis*, KMSP-TV, Feb. 3, 2014; David Hanners, *Minneapolis Intruder Killed Samaritan with Homeowner's Gun, Charges Say*, Pioneer Press, Feb. 2, 2014; *Man Charged in "Good Samaritan" Slaying Assaulted Victim's Wife, New Charges Say*, Pioneer Press, March 6, 2014; Joy Powell, *Good Samaritan's Last Act Led to His Death on Minneapolis' North Side*, Star Tribune, Feb. 13, 2014; Aaron Rupar, *Devon Parker Killed North Mpls Good Samaritan with His Own Gun, Charges Say*, City Pages, Feb. 3, 2014; Web Staff, *Good Samaritan's Last Act of Kindness Ends in His Murder*, Fox8 TV, Feb. 3, 2014.

that read: "Did the State prove beyond a reasonable doubt that the offense occurred inside Sonnenberg's home?" The court accepted the verdict and ordered a presentence investigation.

The presentence investigation determined that Parker had a criminal history score of 3, and therefore the presumptive range for his offense was 312 to 439 months. At the sentencing hearing, the State asked the court to impose a 480-month sentence, which reflected a 41-month upward durational departure, based on the jury's finding that the offense occurred inside Sonnenberg's home. *See* Minn. Sent. Guidelines 2.D.3.b(14) (providing that when "[t]he offense [i]s committed in a location which the victim had an expectation of privacy," a defendant's sentence may be enhanced). Parker asked the court to impose a sentence of 312 months, the bottom of the presumptive range, because the record supported three mitigating factors: (1) "[t]he victim was an aggressor," (2) "[t]he offender ... participated under circumstances of coercion or duress," and (3) "[o]ther substantial grounds exist that tend to excuse or mitigate the offender's culpability, although not amounting to a defense." Minn. Sent. Guidelines 2.D.3.a(1), (2), (5).

The court imposed a 480-month sentence. Explaining its decision, the court said: "So what I have here is, given the jury's answer to [the special interrogatory], that this occurred in Mr. Sonnenberg's own home, I can conclude that it occurred in a zone of privacy. The law does protect people's homes. It's kind of a refuge for everybody." The court rejected Parker's argument that the record contained mitigating sentencing factors, explaining that: "In response to what you say, that you participated under duress, and that the victim was an aggressor, those are arguments, arguments that the jury did not

accept, so I don't either. So I don't find grounds for any downward departure or mitigating circumstances."

Parker raised three arguments on appeal. First, he argued that the district court abused its discretion when it denied his motion for a change of venue. Second, Parker argued—for the first time—that the county attorney committed misconduct during the February 2014 press conference when he commented on Sonnenberg's character, Parker's criminal history, and Parker's refusal to speak to the police. Third, Parker argued—also for the first time—that the jury's finding that the offense occurred in Sonnenberg's home failed to provide a valid basis for the upward sentencing departure.

In an unpublished opinion, the court of appeals rejected Parker's first claim—that the district court abused its discretion in denying Parker's motion for a change of venue. *State v. Parker*, No. A15-1417, 2016 WL 5888672, at *2 (Minn.App. 2016). The court emphasized that the news stories "mostly recounted the facts" and that any effects from the inflammatory reporting on the killing were "mitigated by the passage of time." *Id.* at *1. Moreover, during voir dire, "none of the prospective jurors indicated that they knew anything about the case or recognized Parker." *Id.* The court also rejected Parker's claim that defense counsel could not test the prospective jurors' familiarity without uttering the phrase "Good Samaritan," concluding instead that counsel "made a strategic decision not to ask such questions." *Id.*

The court of appeals likewise rejected Parker's second claim, which alleged prosecutorial misconduct by the county attorney. *Id.* at *2. Because Parker did not raise this argument before the district court, the court of appeals applied the plain-error standard of review. *Id.* The court, placing the burden on Parker, rath-

er than the State, concluded that "Parker has failed to show that any such prosecutorial misconduct affected his substantial rights." *Id.*

As to Parker's third argument, which challenged the upward sentencing departure, the court of appeals reversed Parker's sentence and remanded for imposition of a 366-month sentence, the middle of the presumptive range. After describing Parker's sentence as an "upward durational departure" of "114 months,"[3] the court reasoned that the district court erroneously failed to consider that Parker was held in Sonnenberg's home against his will before it applied the aggravating sentencing factor. *Id.* at *3. Both Parker and the State petitioned this court for review.

## ANALYSIS

### I.

■ We first consider Parker's claim that the district court abused its discretion when it denied his motion to change venue because of the pretrial publicity surrounding the crime. Minnesota Rule of Criminal Procedure 25.02, subdivision 3, requires a district court to grant a motion for change of venue if the defendant proves a "reasonable likelihood" of an unfair trial. We review a district court's denial of a motion to change venue for an abuse of discretion. *State v. Fairbanks*, 842 N.W.2d 297, 302 (Minn. 2014). Although a defendant need not show "actual prejudice" to prevail on a change of venue motion at the trial court, a defendant must prove "actual prejudice"

on appeal of a denial of the motion to change venue. *State v. Warren*, 592 N.W.2d 440, 448 n.15 (Minn. 1999). To prove "actual prejudice," an appellant must prove that the pretrial publicity "affected the minds of the specific jurors involved in the case." *Id.* at 447. Parker bears the burden to prove that the district court's failure to grant his motion to change venue caused him actual prejudice. *Id.*

The record does not reveal any evidence that the jurors were exposed to any pretrial publicity, or had knowledge of Parker or the charges he faced, which is made clear by their responses to the questions from the court during voir dire. Parker does not dispute that the jurors were being honest, much less provide any evidence to the contrary, and therefore fails to show that the publicity in any way "affected the minds of the specific jurors in the case."[4]

■ Further, even if some of the jurors *had* been exposed to pretrial publicity, this exposure alone would be insufficient to show that the publicity "affected the minds" of those jurors. Instead, the test is whether those jurors would be unable to "set aside [their] impression[s]" to "render an impartial verdict." *Id.* at 447–48. In *Warren*, we upheld a district court's decision to deny a change of venue motion even though 14 of the 15 jurors had "read one or more newspaper articles or had seen accounts of the murders on television." *Id.* at 448. We held that the defendant "failed to show that pretrial publicity affected the minds of the jurors or that he

---

3. The court of appeals erroneously described Parker's sentence as including a 366-month period imposed as the presumptive sentence and an additional 114-month upward departure. *Parker*, 2016 WL 5888672 at *2. However, because the guidelines' "presumptive range" was 312 to 439 months, Parker's 480-month sentence included an upward durational departure of only 41 months.

4. Having concluded that Parker failed to establish that he was actually prejudiced by the district court's denial of his motion to change venue, we need not consider what, if any, impact internet publicity has on our venue jurisprudence.

was actually prejudiced by the publicity" because there was no indication "that they would have any difficulty rendering an impartial verdict." *Id.* Because Parker has produced no evidence that any jurors knew anything about him, or that even if they did, those jurors would not be able to render an impartial verdict, we conclude that Parker has not met his burden to show actual prejudice.[5]

## II.

■ We next turn to Parker's claim that the county attorney committed misconduct during the pretrial press conference that deprived him of a fair trial. *See State v. Smith*, 876 N.W.2d 310, 334 (Minn. 2016) (noting that prosecutorial misconduct occurs when "the prosecutor's acts 'have the effect of materially undermining the fairness of a trial'" (quoting *State v. Fields*, 730 N.W.2d 777, 782 (Minn. 2007))). Parker claims that the county attorney in this case violated standards of conduct we adopted in *State ex rel. Pittman v. Tahash*, 284 Minn. 365, 170 N.W.2d 445, 448 (1969) (noting that we "cannot condone the ac-

tions" of a prosecutor who "ma[de] available for publication" various statements which "seriously threatened to have [an] effect upon prospective jurors residing in the community"), as well as ABA Standards of Conduct, *see State v. McCray*, 753 N.W.2d 746, 753 (Minn. 2008) ("We have previously looked to ABA standards as a model when evaluating claims of prosecutorial misconduct."); *State v. Ramey*, 721 N.W.2d 294, 301 (Minn. 2006) ("We expect that prosecutors ... are aware of our case law proscribing particular conduct as well as the standards of conduct prescribed by the ABA"); *State v. Johnson*, 616 N.W.2d 720, 729 (Minn. 2000) ("In evaluating claims of prosecutorial misconduct we have looked to the American Bar Association Standards for Criminal Justice as a model."). Because Parker failed to assert a prosecutorial misconduct claim in the district court, however, our review is limited.[6] Both parties contend—in their briefing and at oral argument—that the plain-error standard of review applies to the county attorney's pretrial press conference statements because, in their view, Parker's

---

5.  Parker attempts to excuse his failure to establish actual prejudice by claiming we should presume prejudice in his case. We acknowledge that in *Sheppard v. Maxwell*, the United States Supreme Court held that "at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process." 384 U.S. 333, 352, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Nevertheless, *Sheppard* is inapposite. The jurors in *Sheppard* were "subjected to newspaper, radio and television coverage *of the trial* while not taking part in the proceedings"; did not receive "adequate directions not to read or listen to anything concerning the case"; and "were thrust into the role of celebrities" when pictures of them and their addresses appeared in newspapers during the trial, which exposed them to anonymous letters with outside opinions on the case. *Id.* at 353, 86 S.Ct. 1507 (emphasis added). Further, the trial began during the campaign leading up to a "hotly contested

election" cycle in which the judge and prosecutor were candidates. *Id.* at 354, 86 S.Ct. 1507. The Court opined that the candidates' desire for publicity may have been a reason for the "unprecedented" "erection of a press table for reporters" inside the courtroom near the jury box during trial. *Id.* at 355, 86 S.Ct. 1507. Because the facts of Parker's case do not resemble those of *Sheppard*, especially because the jurors here were not exposed to newspaper, radio, and television coverage during the trial, we conclude that Parker's trial was not "inherently lacking in due process."

6.  As part of his change of venue motion to the district court, Parker discussed the statements made by the county attorney during the pretrial press conference. Based on our review of the record, we conclude that the change of venue motion did not adequately raise a standalone claim of prosecutorial misconduct to the district court.

prosecutorial misconduct claim is "unobjected-to prosecutorial misconduct" constituting ordinary trial error.[7]

■ When reviewing alleged prosecutorial misconduct for plain error, we use a modified test. *State v. Wren*, 738 N.W.2d 378, 393 (Minn. 2007). Under this modified test, the defendant has the burden to prove the existence of an error that is plain. *Ramey*, 721 N.W.2d at 302. If the defendant establishes error that is plain, the burden shifts to the State to demonstrate that the plain error did not affect the defendant's substantial rights.[8] *Id.* A plain error affects a defendant's substantial rights if it "was prejudicial and affected the outcome of the case." *State v. Griller*, 583 N.W.2d 736, 741 (Minn. 1998). An error is "prejudicial" if there is a "reasonable likelihood that the error had a significant effect on the jury's verdict." *State v. Cao*, 788 N.W.2d 710, 717 (Minn. 2010). To evaluate the effect on substantial rights, we consider various factors, including "the pervasiveness of improper suggestions"

and "the strength of evidence against the defendant." *Id.* If the State fails to demonstrate that the alleged error did not affect the defendant's substantial rights, we consider whether the error should be addressed to ensure fairness and the integrity of judicial proceedings. *Id.* at 715. On the other hand, if the State meets its burden, we need not decide whether the prosecutor committed an error that was plain. *See Montanaro v. State*, 802 N.W.2d 726, 734 (Minn. 2011) (explaining that "to the extent that any of the prosecutor's statements made during closing argument constituted misconduct, that misconduct ... did not have a significant effect on the jury's verdict and thus did not affect Montanaro's substantial rights").

Here, we are convinced that there is no "reasonable likelihood" that the county attorney's statements during the press conference, even if these comments formed the basis for the subsequent media coverage, affected Parker's substantial rights.[9]

---

7. The parties do not address the distinction between unobjected-to trial errors and legal theories that were not presented to the trial court. *Compare State v. Pearson*, 775 N.W.2d 155, 161 (Minn. 2009) (noting that the doctrine of trial-error forfeiture "encourages [litigants] to *object while in the trial court* so that any errors can be corrected before their full impact is realized" (emphasis added)), *with State v. Roby*, 463 N.W.2d 506, 508 (Minn. 1990) (explaining that "[w]e do not decide issues which are not first addressed by the trial court and are raised for the first time on appeal"). Although we have never addressed whether prosecutorial misconduct during a pretrial press conference is subject to plain-error review of the sort traditionally reserved for trial errors when contemporaneous objection and court ruling is possible, here, we assume without deciding, that the plain-error doctrine controls our review of prosecutorial misconduct arising from the pretrial press conference.

8. Applying plain-error analysis, the court of appeals erroneously placed the burden on

Parker to prove that the alleged error affected his substantial rights. *Parker*, 2016 WL 5888672, at *2 ("*Parker has failed to show that any such prosecutorial misconduct affected his substantial rights.*" (emphasis added)). *Ramey* clearly establishes that the defendant has the burden to prove *only* that there was an error that was plain. *Ramey*, 721 N.W.2d at 299–300. The burden then shifts to the State to prove that the defendant's substantial rights were not affected. *Id.* at 300 ("[T]he prosecution should bear the burden of demonstrating that its misconduct did not prejudice the defendant's substantial rights.").

9. In reviewing the county attorney's statements from the February 2014 press conference for prosecutorial misconduct, the court of appeals noted that it "ha[d] some concerns about this press conference." *Parker*, 2016 WL 5888672, at *2. Similarly, though not squarely presented with the issue of prosecutorial misconduct, the district court found the statements by the county attorney to be "argumentative" and "inappropriate." The State conceded in oral argument that some of the

As discussed above, none of the jurors were exposed to any pretrial publicity or had knowledge of Parker or the charges he faced, which is apparent from their responses to the questions by the court during voir dire.[10] Nor did any jurors recognize Parker during voir dire or claim to have any familiarity with the charges, suggesting that the county attorney's statements from the press conference did not pervade the jurors' considerations. Moreover, the evidence against Parker was strong. Parker does not dispute that he shot Sonnenberg. The State presented testimony from Sonnenberg's wife, who was within earshot in an adjoining room, that Parker sounded hostile toward Sonnenberg, as if he was "trying to scare" him.

In sum, because the jurors stated under oath that they had no knowledge of Parker or the case and the evidence of guilt was strong, the State has established that the alleged prosecutorial misconduct did not affect Parker's substantial rights, and therefore the court of appeals properly affirmed Parker's conviction.

### III.

■ On cross-appeal, the State contends that the court of appeals erred in reversing the 480-month sentence imposed by the district court. The State claims the court of appeals "recast" the version of events found by the jury, thereby improperly inserting itself into a fact-finding role. Parker responds that the court of appeals properly reversed the district court's enhanced sentence, because the district court abused its discretion in applying the aggravating factor and summarily rejecting Parker's mitigating factors.

■ We review an upward departure from a presumptive sentence for an abuse of discretion. *Williams v. State*, 361 N.W.2d 840, 844 (Minn. 1985). If the reasons given for the departure are inadequate and there is insufficient evidence to justify the departure, the departure will be reversed. *Id.*

■ Upward departures from presumptive guideline sentences are warranted only when "substantial and compelling circumstances" of the offense render a defendant's conduct "significantly more serious" than the typical crime. *Tucker v. State*, 799 N.W.2d 583, 588 (Minn. 2011) (explaining the "fundamental requirement" that upward departures are permitted "only when a defendant's conduct in the

---

county attorney's statements were "problematic," particularly those commenting on Parker's exercise of his constitutional right against self-incrimination. We do not disagree with these characterizations; nevertheless, we still conclude that regardless of the impropriety of the statements, they did not affect Parker's substantial rights.

10. Parker claims that he was unable to question the potential jurors about their knowledge of any pretrial publicity without using the phrase "Good Samaritan." He claims that—more than his name and the charges—this phrase was the moniker by which a community member, and potential juror, would know of his case. Parker contends that his attorney was unable to use that phrase in voir dire at the risk of *himself* inserting the vic-

tim's character into the case. But it is hard to imagine how the inability to use this phrase during voir dire affected Parker's substantial rights, specifically because this phrase was not used at trial. In other words, if Parker's argument is that the jurors would recognize his case on the basis of the phrase "Good Samaritan" alone, the fact that this phrase was never used at trial alleviates his concern that the jurors would ever be able to recall any preexisting knowledge or bias about the case. To the extent that Parker argues that there were other facts adduced at trial that would cause the jurors to recall their knowledge of the alleged prosecutorial misconduct from the press conference, Parker should have asked about the press conference at voir dire.

commission of an offense is significantly more serious than that typically involved in the commission of the offense in question"). Committing a crime within an area where the victim has an expectation of privacy has been recognized by statute, the sentencing guidelines, and our case law as a reason why an offense may be "significantly more serious" than a typical crime. Minn. Stat. § 244.10 subd. 5a (14) (2016) (listing as an aggravating factor the fact that "the offense was committed in a location in which the victim had an expectation of privacy"); Minn. Sent. Guidelines 2.D.3.b(14); *State v. Kindem*, 338 N.W.2d 9, 17–18 (Minn. 1983) ("We have recognized as an aggravating circumstance the instance where a criminal, in committing a crime such as rape or robbery, invades the zone of privacy that surrounds the victim's home.").

The jury in this case answered a special interrogatory, specifically finding that the crime was committed in Sonnenberg's home.[11] Based on the jury's finding of fact, the district court concluded that the offense was significantly more serious than the typical offense, based on the zone-of-privacy factor listed in Minn. Stat. § 244.10, subd. 5a (14).[12] The court of appeals, however, opined that this aggravating factor was a "less persuasive" justification for an upward departure in this particular case, because Parker was "held

in the home against his will" by Sonnenberg, who would not produce the key permitting Parker to leave through the back door.

On appeal to this court, Parker acknowledges that the jury affirmatively answered a special interrogatory that the crime occurred in the Sonnenbergs' home. Nevertheless, he claims that this fact alone does not show that Parker's conduct was "significantly more serious" than the typical crime. Specifically, Parker argues, as he did to the court of appeals, that we have only affirmed the use of the zone-of-privacy factor to enhance a sentence from the presumptive range when an *additional* rationale has provided the "substantial and compelling circumstances" necessary to render the conduct "significantly more serious" than a typical crime. Parker further argues that "a jury's finding that a crime took place inside a home, alone, does not automatically result in a determination by the district court that the defendant violated the victim's zone of privacy."

Parker also asserts that, historically, we have only acknowledged two rationales to justify the use of the zone-of-privacy factor in enhancing a sentence: (1) a recognition that a crime committed in a victim's zone of privacy causes the victim to fear remaining in that zone of privacy after the crime occurs, *State v. Van Gorden*, 326

---

11. Parker does not dispute, before this court, that the Sonnenbergs had an expectation of privacy in their home when the crime occurred.

12. As we stated in *State v. Rourke*, although the facts that serve as the basis for the departure must be found by the jury (here, that the crime occurred in Sonnenberg's home), the district court's explanation for why the fact provides the "substantial and compelling" circumstances warranting departure is not a "fact" that poses a *Blakely* problem if relied on by the district court. 773 N.W.2d 913, 920 (Minn. 2009) ("These explanations do not involve finding facts, nor is it a role that has traditionally belonged to the jury. Consequently, these discretionary acts by the district court are not subject to the rule announced in *Blakely*."). Accordingly, the district court's determination that Parker committed the crime in Sonnenberg's zone of privacy—therefore making it a particularly serious crime—does not pose a *Blakely* problem. *Id.* at 921 ("[T]he question of whether those additional facts provide the district court a reason to depart does not involve a factual determination and, therefore, need not be submitted to a jury.").

N.W.2d 633, 635 (Minn. 1982) ("[T]he victim [had] to contend psychologically not only with the fact that she was assaulted in a brutal way but also with the fact that her home is no longer the island of security that she perhaps thought it was."); and (2) situations in which the defendant has "invaded" the home as a deliberate trespasser, *Kindem*, 338 N.W.2d at 17–18 ("We have recognized as an aggravating circumstance the instance where a criminal … *invades* the zone of privacy that surrounds the victim's home." (emphasis added)); *State v. Jones*, 328 N.W.2d 736, 738 (Minn. 1983) ("The robbery occurred in the victim's home and therefore involved *invading* the zone of privacy that surrounds the victim's home." (emphasis added)). Parker argues that because neither of these rationales apply to this case, the mere fact that the crime occurred in the Sonnenbergs' home does not provide the "substantial and compelling circumstances" to conclude that the conduct was substantially more serious than the typical crime.

Parker is correct that we have previously applied the zone-of-privacy factor in cases in which the crime caused either a continuing fear of harm in the home *or* involved a deliberate invasion. He also correctly points out that neither of the previously cited rationales is satisfied here, because Sonnenberg—who is deceased—

has no continuing fear in his home, nor was his home invaded by a deliberate trespasser. Nevertheless, nothing in the sentencing statute or the case law applying this factor suggests that one of these two rationales is required before we conclude that the zone-of-privacy factor is a sufficient basis to enhance a sentence from the presumptive guidelines range.[13] Accordingly, we conclude that the zone-of-privacy factor applies with equal force when an occupant of a home, while attempting to help another in need, invites an individual into his or her home at personal risk and the invitee commits a murder in the home. Consequently, the district court did not abuse its discretion when it concluded Parker's offense was significantly more serious than the typical offense, based on the zone-of-privacy factor listed in Minn. Stat. § 244.10 subd. 5a (14).[14]

### CONCLUSION

For the foregoing reasons, we affirm the court of appeals' decision as to the conviction but reverse it as to the sentence.

Affirmed in part and reversed in part.

MCKEIG, J., took no part in the consideration or decision of this case.

---

**13.** In discussing Parker's claim that the zone-of-privacy factor applies only when one of the two rationales is present, the court of appeals erroneously stated that it had accepted such an argument in *State v. Bock*, 490 N.W.2d 116 (Minn.App. 1992), *rev. denied* (Minn. Aug. 27, 1992). In *Bock*, however, the court of appeals rejected an argument that the zone-of-privacy factor never applies in a homicide case, explaining that the principles underlying the zone-of-privacy factor apply to a subset of homicide cases—those in which the defendant has deliberately trespassed. *Id.* at 121. Consequently, *Bock* is not helpful to Parker's argument.

**14.** The court of appeals was persuaded by Parker's argument that the district court "summarily rejected" his mitigating factors, particularly the mitigating factor of duress. Based on our review of the record, the district court adequately considered Parker's argument that he was under duress. The district court expressly stated: "In response to what you say, that you participated under duress, and the victim was an aggressor, those are arguments, arguments that the jury did not accept, so I don't either. So I don't find grounds for any downward departure or mitigating circumstances."